The ROCONA et al. v. GUY F. ATKINSON CO.

No. 11885.

United States Court of Appeals Ninth Circuit.

April 2, 1949.

Hill, Morgan & Farrer and William S. Scully, all of Los Angeles, Cal., for appellants.

McCutchen, Thomas, Matthew, Griffiths & Greene, Harold A. Black and George E. Toner, all of Los Angeles, Cal., for appellee.

Before MATHEWS and STEPHENS, Circuit Judges, and DRIVER, District Judge.

DRIVER, District Judge.

This is an appeal from an interlocutory decree in admiralty adjudging the appellants liable for damage to appellee's unpowered barge and for the partial loss of its cargo.

In March, 1945, appellee was constructing a mole in Los Angeles Harbor, and, in the prosecution of the work, was using a number of barges to transport rock from Catalina Island. About 1:30 p. m., on March 31, appellant Tug Rocona, hereafter called the Rocona, operating under a contract of hire, took in tow appellee's Barge No. 4414 and another barge, which had been loaded with rock by appellee at the Island, and towed them to the harbor. Barge No. 4414 was 119.7 feet long and 39.5 feet across the beam. It was rectangular, flat on the bottom, and had a "rake" or overhang at both the bow and the stern. At each forward corner there was a mooring bit or Sampson post. Loaded with rock, it had a gross tonnage of 1200 and an average draft of nine feet. Its loading was somewhat uneven. It had about three feet of freeboard in the bow and only 10 to 20 inches in the stern, but, beyond question, the craft was seaworthy. The passage across Catalina Channel was accomplished without difficulty and without unusual incident.

Inside Los Angeles Harbor, one of the barges was turned over to another tug, and the Rocona towed Barge No. 4414 to a mooring float, maintained by appellee. The float was a solid, wooden block, ten feet square and four feet thick. On the top and on the bottom there were semi-circular iron "U" bolts, 1½ inches thick and about 10 inches high. The float was anchored by means of a cable which extended from the lower "U" bolt to heavy bolders resting on the bottom. A steel mooring pendant, approximately 40 feet long was attached to the upper "U" bolt. A large eye had been spliced into its free end. As the Rocona approached the float, one of her crewmen, who had been placed aboard the barge, picked up the pendant with a pike pole and dropped the eye over the starboard forward Sampson post. The tow wire was released from the barge and the Rocona went to her berth some distance away. According to her log, the barge was moored to the float at 12:45 a. m., April 1.

Shortly thereafter, appellee's night superintendent, making a periodic inspection tour of the harbor in a speed-boat, saw the barge and observed that it was "just about trim." When he made his next tour, an "hour or hour and a half later", the barge was listing badly and had slipped a part of its load of rock.

When the barge was capsized the next day, it was discovered that a hole, the size and shape of the "U" bolts on the float, had been punched through the bottom planking, about 22 feet back of the bottom of the forward rake and five feet in from the starboard side. Two of the bottom planks, which were twelve inches wide and four inches thick had been broken. The distance from the starboard Sampson post to the hole, measured around the rake and along the bottom, was approximately forty feet. Extending forward from the hole eight feet or so there was a groove or scratch which appeared to have been caused by some rounded object such as a "U" bolt.

When the barge was moored, the wind was negligible. The ordinary surges and currents of the harbor were present. There was a high tide of 4.91 feet at 11:30 p. m., March 31 and a low tide of .61 feet at 6:12 a. m., April 1.

At the trial, there was competent expert testimony that, with the ordinary conditions of the current, tide, and surge in Los Angeles Harbor, the barge could not have

overridden the float and that the application of some additional force or motive power was necessary to accomplish that result. There was also expert testimony that, with the hole discovered when it was capsized, the barge would begin to list in a half hour to an hour and that with such a hole and loaded with rock, it could not have made the crossing from Catalina Island.

The master and two members of the crew of the Rocona testified that the barge was brought up to the mooring float slowly and carefully on the night of March 31, that the Rocona's power was shut off some distance away to allow the barge to drift gently up to the float, and that the barge was dead, or practically dead, in the water when the mooring pendant was attached to it. They also testified that before leaving the barge, they turned a search light upon it and "circled" it to see that everything was in order. They denied that they had caused the barge to override the float.

The Trial Court found that when the barge was brought up to be moored, the momentum of its forward motion carried it over the float until it had taken up the slack in the anchor cable and mooring pendant when it was brought to a stop and a "U" bolt on the float was driven through its bottom planking. The Court further found that the Rocona was negligent in a number of particulars, one of which was that it failed to take any steps to stop the forward motion of the barge, and that the negligence of the tug was the sole and proximate cause of the injury to the barge. The Court also found that appellee was not negligent in any respect in the manner or condition of loading of Barge No. 4414 or in furnishing or maintaining the float to which the barge was moored.

The testimony was all given orally in the presence of the Trial Court and if the findings are supported by substantial evidence and are not clearly erroneous, they should stand undisturbed on this appeal.[1]

The appellants contend that the findings are not supported by the evidence and are erroneous. They point out that there is no direct evidence of negligence and argue that negligence may not be inferred from circumstances under the rule of res ipsa loquitur for the reason that the rule is not applicable here. It may not properly be invoked, they say, for two reasons: first, because it was not shown that at the time of the injury to the barge, the appellants had exclusive control of the instrumentality that caused it, and, second, because the facts are not such as to warrant an inference that appellants were negligent.

A generally recognized prerequisite to the application of the rule of res ipsa loquitur is that the instrumentality causing the injury must have been under the exclusive control of the party charged with negligence.[2] However, in applying the rule in two comparatively recent cases, Jesionowski v. Boston & Maine R. Co., 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416, 169 A.L.R. 947, and Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, the Supreme Court has indicated that such judicially defined prerequisites should not be taken too literally or followed too closely. The primary consideration should be whether, in the particular case, the circumstances are such as to sustain an inference that the injury was the result of the defendant's negligence. In both cases, the Court called attention to the statement in Sweeney v. Erving, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815,

---

[1] The Golden Star, 9 Cir., 82 F.2d 687; Lillig v. Union Sulphur Co., 9 Cir., 87 F.2d 277; Stockton Sand & Crushed Rock Co., Inc., v. Bundensen, 9 Cir., 148 F.2d 159; Stetson v. United States, 9 Cir., 155 F.2d 359; Bornhurst v. United States, 9 Cir., 164 F.2d 789; Meintsma v. United States, 9 Cir., 164 F.2d 976; Heder v. United States, 9 Cir., 167 F.2d 899.

[2] In San Juan Light & Transit Co. v. Requena, 224 U.S. 89, 98–99, 32 S.Ct. 399, 401, 56 L.Ed. 680, the rule was defined as follows: " * * * when a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as, in the ordinary course of things, does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care." See also authorities cited in the opinion, p. 99, and IX Wigmore on Evidence, 3rd Ed., Sec. 2509, p. 381.

Ann.Cas.1914D, 905, that "res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference". It is not necessary that the facts be explicable only on the theory of negligence. It is sufficient if the facts are such as to fairly support an inference of negligence. If an inference is justified, it will support, but it does not require, a finding of negligence. It affords merely an evidentiary element to be considered and weighed by the trier of the facts along with all the other evidence in the case.

In the Jesionowski case, an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for damages for the wrongful death of a brakeman, it appeared from the evidence that the railroad did not have exclusive control of all the instrumentalities that may have caused the brakeman's death. Some of them had been under the control of the deceased, but the Court held that since the jury found from conflicting evidence that the instrumentalities under the brakeman's control had no causal connection with his fatal injuries, it was proper to apply the rule of res ipsa loquitur on the assumption that the railroad had exclusive control of the remaining probable causitive instrumentalities. The plain implication of the case is that it is not necessary, as a prerequisite to the application of the rule, that the party having the burden of proof of negligence establish by direct or conclusive evidence that his adversary had exclusive control of the causitive instrumentalities. The trier of the facts may first find that there was exclusive control from conflicting evidence in the same manner as any other ordinary factual issue is resolved in a civil action and then apply the rule.

The evidence in the present case depicts an extraordinary occurrence. We need not rely upon expert testimony to assume that a 1200 ton barge with a nine foot draft, in a sheltered harbor, with no appreciable wind, would not, without extraneous propulsion, ride upon and submerge a solid, wooden, mooring float, ten feet square and four feet thick, with such force as to cause a rounded "U" bolt on the float to break through the sound, four-inch thick planking on the bottom of the barge.[3] The location and character of the scratch or groove leading to the hole in the barge, and the fact that the distance from the Sampson post, to which the mooring pendant was attached, to the hole equaled the length of the pendant, justify the conclusion that just before it was holed, the barge was moving forward and that when it was snubbed at the end of the pendant, the force of its unexpended momentum drove the "U" bolt through the planking. There was no agency present other than the Rocona capable of imparting that amount of momentum to the barge. Without the negligence of the tug in failing to check the forward movement of the barge at the time of mooring, the damage could not have occurred.

Other uncontroverted circumstances are consistent with the conclusion that the barge was damaged at the time it was moored. When appellee's night superintendent made his rounds shortly after the mooring, the barge was riding trim. When he came around again, an hour or an hour and a half later, the barge was listing "quite badly" and had slipped a part of its cargo. The unchallenged, expert testimony was that in its damaged condition, the barge would begin to list in a half hour to an hour.

Appellants suggest that the float may have been waterlogged or its anchor cable too short, thus causing the barge to override the float without the application of any external motive force. Appellants' witnesses testified that moss had accumulated on the sides of the float and that on the night of March 31, the float was low in the water with only about two inches of freeboard, but there is no other evidence in the record to support their theories and there is considerable evidence to the contrary. One witness testified that the anchor cable was 75 feet long and that the water at the float at low tide was approximately 28 feet deep.[4]

---

[3] There was testimony that the barge was built of seasoned lumber in 1944, the year before it was damaged.

[4] The master of the Rocona testified that the depth of the water at the place where the float was anchored was between 18 and 25 feet at low tide.

High tide on March 31 added only about 5 feet to the water's depth. The float was not submerged when the Rocona approached it with the barge in tow. The master of the tugboat testified that when he turned his spot light on it that night, he could see the float from a distance of 1,000 to 1,200 feet. Tidal action and a short anchor cable could not subsequently have submerged it for the reason that the tide had been going down from its flood stage for an hour and a quarter before the barge was moored and continued to ebb until long after the barge was discovered in a damaged condition. That the float was not water logged is indicated by the testimony of a crewman of the Rocona that when he saw it on April 1, the float had some eight or ten inches of freeboard. Moreover, the theory that the float may have been so water-logged that it slipped down under the bottom of the barge is not a logical explanation of the barge's injury. It seems highly improbable that a float in such condition could have exerted sufficient upward buoyant force to drive a blunt and rounded "U" bolt through bottom planking four inches thick.

Appellants argue that the Trial Court erred in finding the Rocona negligent in the mooring of appellee's barge despite the unequivocal and uncontradicted testimony of the master and crew of the tugboat that they exercised due care and were not negligent in any particular whatsoever. Appellee's witnesses were not contradicted by direct evidence, it is true, but their testimony was in sharp conflict with the circumstantial evidence offered by the appellee. As we have pointed out, the evidence is sufficient to support a reasonable inference of negligence on the part of appellants. In fact, it may fairly be regarded as excluding every reasonable theory other than negligence. The Trial Court considered the conflict thus presented and deliberately resolved it against the direct evidence and in favor of the circumstantial evidence.[5] In this connection, it should be remembered that appellants' witnesses, the master and crewmen of the Rocona, could not be regarded as disinterested. It was obviously in their interest to exonerate their vessel and themselves. Aside from the question of the interest of witnesses, however, in such a situation, circumstantial evidence may be as cogent and convincing as direct evidence and may properly be found to outweigh conflicting direct evidence.[6]

The Trial Court's findings that the injury to the barge occurred at the time it was moored and that appellants' negligence proximately caused the injury are amply supported by the evidence and do not appear to be manifestly erroneous. The findings should not be disturbed.[7]

Decree affirmed.

[5] In orally announcing his decision, the Court said: "The Court reached this conclusion [that the damage to the barge was caused by the negligence of the appellants] from all the evidence. I think that the circumstances, the physical facts, speak louder than the witnesses in this instance." The Court also made the following formal finding: "The Court finds that the testimony of the witnesses of respondents and claimant that they moored said barge properly is not convincing and cannot be accepted."

[6] 32 C.J.S., Evidence, § 1039; Leon v. Kitchen Bros. Hotel Co., 134 Neb. 137, 277 N.W. 823, 115 A.L.R. 1078; Black Motor Co. v. Spicer, 290 Ky. 111, 160 S.W.2d 336; Stark's Adm'x v. Herndon's Adm'r, 292 Ky. 469, 166 S.W.2d 828, 830; Parsons v. Easton, 184 Cal. 764, 195 P. 419; Moffett v. Bozeman Canning Co., 95 Mont. 347, 26 P.2d 973, 978; Fidelity & Casualty Co. v. Yellow Cab Transit Co., 197 Okl. 581, 173 P.2d 432, 436; Gray v. Southern Pac. Co., 23 Cal.2d 632, 145 P.2d 561, 566.

[7] See footnote 1.