[Civ. No. 5645.   Third Appellate District.—October 14, 1936.]

CLARENCE HANSEN, Trustee, etc., Respondent, v. CALIFORNIA BANK (a Corporation) et al., Appellants.

Swanwick, Donnelly & Proudfit, William B. Himrod and Donald O. Welton for Appellants.

William P. Redmond, Louis B. Minter and Redmond & Redmond for Respondent.

THOMPSON, J.—The defendants have appealed from a judgment which was rendered against them for $13,935.91 and interest in favor of the plaintiff, as trustee of the American Jobbers, Inc., a bankrupt corporation, being the amount paid to the bank by the American Jobbers corporation in 1930 for the purchase of its own corporation stock in violation of the provisions of section 354 of the Civil Code, as it then existed, now sections 341 and 342 of the same code, and contrary to the provisions of section 309 of the Civil Code, as it then existed, now sections 346, 363 and 364 of the same code.

The American Jobbers, Inc., was incorporated in 1924, for the purpose of conducting a produce business, in Los Angeles, with an authorized capital stock of $10,000, consisting of 100 shares of the par value of $100 each. The only stockholders were Bryant, Clark, Daley and Berman. Bryant owned 37 shares of stock. Daley, Clark and Berman were directors of the corporation. In 1930, when the stock in question was purchased, the corporation had an outstanding indebtedness; it possessed cash on deposit in the California Bank of Los Angeles in the sum of about $4,000, but it then had no surplus available for cash dividends. Bryant became indebted to the California Bank and assigned and delivered to it his 37 shares of stock represented by certificate number 6, which he endorsed in blank. This assignment of stock was made pursuant to a trust agreement to secure the debt, but that agreement was unknown to the other shareholders and directors of the American Jobbers corporation. Bryant was in default and unable to pay the bank. Mr. Maulhardt, the agent and representative of the California Bank, informed Clark, Daley and Berman, the directors of the American Jobbers, Inc., a corporation, that the bank owned Bryant's 37 shares of stock and offered to sell them for $16,000. This was agreed upon. The American Jobbers, Inc., purchased the stock at that price, drawing its check upon the California Bank for $4,000, which it then had on deposit in that bank and executed its promissory note for the balance of the purchase price, to wit, $12,000, dated July 25, 1930, payable to the California Bank on demand at the rate of 7 per cent interest per annum. This note was signed by "American Jobbers, Inc., by P. W.

Daley, President, and Paul Berman, Secretary''. The note was endorsed and payment was guaranteed by Daley, Berman and Clark individually. Prior to August 3, 1931, the American Jobbers, Inc., paid to the bank for credit on its $12,000 note the sum of $5,000 and accrued interest. On the last-mentioned date the corporation executed and delivered its note to the bank for the unpaid balance of the original note, to wit, $7,000, and the original note was then surrendered. Prior to July 15, 1932, this debt was reduced to $4,000. A new note for the last-mentioned sum was executed and delivered to the bank in the same form as the original note, including its endorsements. The $7,000 note was then surrendered. Subsequently $700 was paid to the bank and applied on the last $4,000 note. At no time did the American Jobbers, Inc., procure authorization from the corporation commissioner of California to either purchase the 37 shares of stock or make payments thereon. The American Jobbers, Inc., became bankrupt and made a voluntary assignment for the benefit of creditors. Upon proceedings duly presented to the United States District Court for the Southern District of California, the respondent, Clarence Hansen, was appointed and qualified as trustee in bankruptcy of the estate of the insolvent corporation June 26, 1933. On authorization therefor, this suit was commenced against the California Bank and J. G. Maulhardt August 15, 1933, praying for rescission of the sale of the 37 shares of stock to the corporation and for judgment for $13,850, as trust funds held by the bank for the benefit of the estate of the bankrupt corporation. The cause was tried by the court. Findings favorable to the plaintiff, in accordance with the preceding statement of facts, were adopted and judgment was rendered against both defendants as prayed for. From that judgment the defendants have appealed.

The appellants contend that the judgment is not supported by the evidence for the reasons that it does not appear that (1) American Jobbers, Inc., purchased its own stock, (2) The stock was purchased from California Bank, (3) The purchase price of the stock was paid from the capital stock of the corporation, (4) Respondent does not represent the creditors of the corporation, (5) The action is barred by the provisions of section 338, subdivision 4, of the Code of Civil Procedure, and (6) The judgment against the

bank rescinding the purchase of stock is in conflict with the finding that its agent was guilty of fraud, which, in effect, amounts to an affirmance of the contract.

We are of the opinion the findings and judgment are adequately supported by the evidence. The court found that the American Jobbers, Inc., purchased for itself, contrary to law, 37 shares of its own stock from the California Bank of Los Angeles in consideration of the sum of $16,000. There is a conflict of evidence, but it sufficiently appears that Mr. Maulhardt, acting as the agent for the bank, sold to the American Jobbers, Inc., the 37 shares of stock formerly belonging to Bryant. Maulhardt was the vice-president, manager of the marketing department and agent of the bank. Mr. Daley, president of the produce corporation, testified that Mr. Maulhardt told him the bank was forced to take Bryant's 37 shares of stock, and would sell them for $16,000; that they did not want to see the stock get into the hands of a stranger and therefore suggested that the corporation purchase it. Daley told Maulhardt that the produce corporation did not have sufficient money with which to buy the stock, but the vice-president of the bank suggested that it had $4,000 on deposit in his bank, which it could pay in cash, and that the bank would arrange to loan the produce corporation the remaining $12,000 to be represented by its promissory note. The purchase of the stock upon those terms was agreed upon. The corporation drew its check in favor of the bank for the $4,000 which was on deposit there, and also executed and delivered its promissory note for the sum of $12,000, payable to the bank on demand, at 7 per cent interest, payable annually. The note was dated July 25, 1930. The individual stockholders of the produce corporation did not buy the stock. None of the money which was used to pay for the stock belonged to the individual stockholders. It was corporation money, as was also the promissory note. The certificate of stock, signed in blank by Bryant, was then delivered to the corporation. The certificate was cancelled, and separate shares were issued by agreement in the names of the three remaining members of the corporation as follows: 13 shares to Daley and 12 shares each to Clark and Berman. These shares were not delivered to the parties, but were placed in the safe of the corporation and held for delivery when the purchase price and indebted-

ness to the bank was fully paid. The three directors of the corporation testified to substantially these facts. Mr. Daley said in that regard: "Mr. Maulhardt came in the office and said that . . . those shares of stock of Bryant's was going to be sold and (he) didn't want to see a stranger buy it; he thought it would be good for us to buy it, *the American Jobbers*. And he said he could arrange for us to buy the stock. I told him at the time that I didn't want to take that money out of the business, the business would not stand it; and of course he knew how much money we had over there. . . . Mr. Maulhardt said that we could pay him $4,000 cash, and the balance could be paid monthly, plus the interest. . . . When we got this (certificate of stock) we split . . . the shares, the 13, 12, 12, and put them in the safe and figured whenever it was paid for *by the American Jobbers,* why, we would have the entire possession of them."

Mr. Clark testified regarding the sale of the shares: Mr. Maulhardt told him "he had them to dispose of and wanted to dispose of them to us, and it took a layout of $16,000 to handle it, but we didn't have that money to handle it with. He put the proposition to us how it could be handled. . . . It was agreed we would pay $4,000 down and give him a note for the rest of it. . . . Well, they gave us a check for $12,000 for the loan, and we in turn gave them $16,000. Q. When you say 'we, in turn, gave $16,000', who do you mean by 'we'? A. The corporation, . . . American Jobbers. . . . It (the $12,000 note) was to the bank, made payable to the bank, as I recall it. . . . Q. Who purchased it (the stock)? A. The American Jobbers. . . . Q. I will ask you whether or not after your conversation with Mr. Maulhardt did you or did you not set up in the books of the company a charge against the individuals, namely, yourself, Mr. Daley and Mr. Berman with $12,000, or $16,000? A. No sir. . . . (Regarding the party to whom the stock was sold.) Q. What do you mean by saying 'us'? A. Well, from our standpoint we was talking of the company . . . American Jobbers, the three of us. . . . Q. What portion of that $16,000 did you owe the corporation? A. I say I did not consider that I owed it to them. Q. You do not consider that you owe it? A. No."

Mr. Daley also testified to substantially the same facts. He asserted that he never had possession of the stock, or any part of it. In effect, he testified that it was purchased by the corporation, and not by the individual stockholders. It was paid for with funds belonging to the corporation and not by funds of the individual members thereof. He said in that regard: "Q. Mr. Daley, I will ask you whether or not you were indebted to the corporation . . . on account of notes and accounts receivable as a stockholder or officer of this corporation in the sum of $16,000 or any part thereof? A. No sir. . . . Q. Did you ever give anything to the American Jobbers for that stock? A. No, sir."

Regarding the question as to whether the corporation or its individual stockholders purchased the stock, Mr. Redmond, one of plaintiff's attorneys, testified that he had a conversation with Maulhardt, who said in reply to an inquiry from Daley: "Well, why not the bank loan to Berman and Clark and myself this money, and we will buy the shares individually?" To this inquiry Redmond says Maulhardt replied: "No, boys, you can't do that, because, you know, you boys haven't got the financial standing, haven't got the money to pay for the shares of stock; *but the bank will sell these 37 share of stock to the corporation* and loan the $12,000.00 with which it can buy those shares of stock, including $4,000.00 cash for a total of $16,000.00."

The foregoing testimony sufficiently sustains the finding that the stock was purchased and paid for by the corporation and not by the individual stockholders thereof.

It is true that the three directors of the corporation individually endorsed the corporation notes to the bank, guaranteeing their payment. But this is not inconsistent with the theory that it was the corporation's note upon which the bank required additional security in the form of their individual guaranty to pay the notes.

The appellants contend that the finding to the effect that the stock was purchased from the California Bank is not supported by the evidence. On the contrary, they assert that Bryant, the original owner of the stock, sold it to the individual directors of the produce corporation through his agent, Mr. Maulhardt. Upon this issue as to whether Maulhardt sold the stock as the agent of Bryant

or as agent of the bank, the evidence is also conflicting. We are of the opinion there is ample evidence to support the finding that Maulhardt sold the stock as the agent of the bank and not as agent of Bryant. At least there is sufficient evidence to show that Maulhardt was the agent of the bank in that transaction. This would render the bank liable. In support of this theory the record discloses the fact that Maulhardt was vice-president and manager of the marketing and produce department of the bank. He represented to the directors of the corporation that Bryant had transferred the stock to the bank to secure an indebtedness which he owed the bank; that he was in default and that the stock belonged to the bank which was anxious to sell it. Mr. Redmond, one of the attorneys for plaintiff, testified in that regard that he had a conversation with Maulhardt, who said: "I consider myself and the bank very friendly to the American Jobbers; we know the boys very well, so we called in Daley or Clark, . . . or both, and I told them that the California Bank had 37 shares of stock that was assigned in blank to the California Bank as security for a debt evidenced by a promissory note that Bryant owed to the California Bank. *That Bryant fell down on the payment of his note; that the bank took over the shares of stock and has got to realize on the shares of stock.*" The bank was in actual possession of the stock which was assigned by the former owner in blank. In payment for the stock the corporation gave its check *to the bank* for the sum of $4,000 which it had on deposit in that bank, and further executed its promissory note *to the bank* for the balance of the purchase price, to wit, $12,000. Partial payments upon this note were subsequently made. Two other renewal notes were subsequently executed by the corporation *to the bank*. The bank, and not Bryant, was the payee named in each of these notes. They were retained by the bank. They were neither made payable to, nor were they held by Bryant. To refute the assertion that Mr. Maulhardt sold the stock as the agent of the former owner, Mr. Bryant testified: "Q. Have you or have you not authorized and directed Mr. Maulhardt, the California Bank, to sell those shares of stock for you for $16,000? A. I did not. . . . Q. Have you had a conversation with Mr. Maulhardt in the month of July, 1930, with regard to

those shares of stock? A. No, sir. . . . *I never knew those shares were sold until several months afterward.*"

█ Whatever the fact may be with regard to the bank's actual title to the stock, it certainly held the *indicia* of ownership of the stock and it, therefore, had authority to pass title thereto, so as to render the bank liable therefor. With respect to the passing of title to similar shares of stock which were signed by the owner in blank and delivered to a corporation, it was said in *Powers* v. *Pacific Diesel Engine Co.,* 206 Cal. 334 [274 Pac. 512, 73 A. L. R. 1398]:

"It is common knowledge that as between the parties to the transaction the property in shares of stock customarily passes in the ordinary and regular course of trade *by delivery of the certificate endorsed in blank* by the person to whom the certificate purports on its face to have been issued."

Having clothed the bank with the *indicia* of ownership of the shares of stock, by transferring and delivering them to the bank, signed in blank, Bryant may not complain of the subsequent sale and transfer to an innocent purchaser thereof. The Powers case, *supra,* holds in that regard:

"In proper cases, and this case is one, the equities should be examined in accordance with the familiar principles that 'where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer' (Civ. Code, sec. 3543), and that where the true owner clothes another with the *indicia* of ownership of property and therefore the apparent authority to transfer title thereto, and innocent third parties are thereby led into dealing with such apparent owner, the true owner will be estopped to deny that the apparent authority is the real authority. (Code Civ. Proc., sec. 1962, subd. 3.) In such cases the equities are found to be in favor of the *bona fide* purchaser rather than in favor of the owner who has by his own conduct clothed another with the power to commit the fraud."

█ In the present case there is no evidence that the corporation or any of its officers or directors had knowledge that the bank was not the true owner of the stock, or that the bank was not authorized to sell it.

It is true that a declaration of trust was received in evidence over the objection of the plaintiff, which document was executed by A. J. Bryant and wife, as trustors, to California Trust Company, a corporation, as trustee, January 14, 1930, to secure the payment of $10,000 due from the trustors to the California Bank, the named beneficiary of the trust instrument. The debt was evidenced by two $5,000 promissory notes, dated in September and December, 1929, due on demand at 7 per cent interest per annum. This trust instrument authorized the sale and conveyance of two parcels of land in Los Angeles, together with the 37 shares of stock belonging to the Bryants, and a certain mortgage bond of $1,000. The trust instrument provided that for default on the part of the trustors in the payment of any portion of the principal or interest of the indebtedness as provided by the terms of the two promissory notes, when due, the trustee was authorized to sell any of the personal property mentioned therein ''without notice to or demand upon the Trustors, such notice and/or demand being expressly waived''. It does appear that Bryant and his wife were in default of payment of these notes, and that the trustee had authority to sell the stock under the provisions of the trust instrument prior to the time when the stock was sold to the produce corporation by the California Bank. The evidence warrants the inference that Maulhardt, as agent of the bank, represented to the purchaser of the stock that it belonged to the bank and that it was desirous of selling it. That transaction may be reasonably reconciled with the provisions of the trust instrument. Whether the stock was actually sold and transferred to the bank is immaterial so far as this case is concerned. Moreover, our attention is called to no evidence indicating that the corporation or its officers had any knowledge of the existence of that trust instrument. In truth, the evidence is just the contrary. They were ignorant of that fact. The provisions of the trust instrument, therefore, do not relieve the bank of liability in this suit. Its representations that it was the owner of the stock at the time it was sold to the corporation estops it from now denying that fact.

■ The evidence adequately supports the findings of the court to the effect that the American Jobbers, Inc., pur-

chased from and paid to the California Bank the sum of $13,935.91 for 37 shares of its own stock *out of its capital stock*, without authority of the corporation commissioner of the state of California, thereby diminishing and depleting its assets to that extent, and that this payment was not made from surplus funds available for cash dividends.

The purchase of this stock under such circumstances was unauthorized, in contravention of the explicit provisions of law and therefore void. Section 309 of the Civil Code as it existed at the time of this illegal transaction (Stats. 1929, p. 1266) provided in part:

"Unless they shall have been first permitted or authorized so to do by the commissioner of corporations, directors of corporations must not make dividends except from the surplus profits arising from the business thereof; nor must they divide, withdraw, or pay to the stockholders, or any of them, any part of the capital stock, except as hereinafter provided; provided, that dividends may be paid upon shares entitled to cumulative preferential dividends from paid-in surplus, as well as from profits arising from the business, but the holders of such shares shall be notified when dividends are paid from paid-in surplus. Nothing herein prohibits a division and distribution of the capital stock of any corporation which remains after the payment of all its debts, upon its dissolution, or the expiration of its terms of existence. . . . "

Section 354 of the Civil Code, as it then existed (Stats. 1929, p. 1270), limited the power of a corporation with respect to repurchasing its stock, thereby prohibiting the right to do so under the circumstances of this case. It provided in part:

"Every corporation, as such, has power:

. . . . . . . . . . .

"7. To admit stockholders or members, and to sell their stock or shares for the payment of assessments or instalments; provided, that a corporation shall not, in issuing shares or taking subscriptions therefor, agree to repurchase such shares, or give to the subscriber a right to surrender or resell the same to the corporation;

"8. To purchase and cancel upon its books and restore to the status of authorized but unissued shares any of its outstanding shares as follows:

"(a) To collect or compromise in good faith a debt, claim or controversy with any shareholder;

"(b) From surplus available for cash dividends when authorized by vote or written consent of the holders of two-thirds of each class of shares outstanding exclusive of the shares to be purchased;

"(c) From one who as an employee has purchased such shares from the corporation under an agreement giving the ' corporation the right to repurchase; . . .

.    .    .    .    .    .    .    .    .    .    .    ."

The evidence that the corporation did not procure the authorization of the corporation commissioner to purchase its stock is undisputed. Mr. Daley, the president of the corporation, testified in that regard: "Q. Mr. Daley, I ask you whether or not the corporation, the American Jobbers, applied for and obtained a permit from the Corporation Commissioner of the State of California at any time to purchase the shares of stock, the 37 shares of stock from the California Bank or from Bryant? . . . A. No, sir."

The evidence shows that at the time of the agreement to purchase the stock on the part of the corporation it was indebted and then had creditors. It shows that the corporation then possessed $4,000 on deposit with the California Bank. It may be inferred that amount constituted its entire surplus fund, for no evidence was offered to indicate that it possessed more. When Mr. Maulhardt proposed to sell the stock to the corporation for $16,000 Mr. Daley said: "I told him at the time that I didn't want to take that much money out of the business, *the business would not stand it;* . . . It took a layout of $16,000 to handle it, *but we didn't have that money to handle it with."* Moreover, in order to consummate the purchase of the stock, it was necessary for the bank to loan the produce corporation the sum of $12,000, which was evidently paid from subsequent earnings during the period of two years and eight months. In the absence of testimony to the contrary, this is a sufficient *prima facie* showing that the corporation did not then have on hand sufficient capital stock or cash assets with which to purchase the stock over and above the sum required to pay its existing debts.

It was not necessary to prove the corporation was actually insolvent to establish a violation of the provisions of section 309 of the Civil Code, as it then existed, so as

to render the sale of stock invalid.ʼ In construing a similar statute which existed in the state of Ohio, it is said in the case of *Rheinstrom* v. *Seasongood,* 19 Ohio N. P. (N. S.) 393, 27 Ohio Dec. 430, as reported in 55 A. L. R. 103, note:

"The facts that the corporation might not have been actually insolvent at the time of the payment of a dividend, and that no then existing creditors were harmed, have been held not to prevent recovery of the dividend by the trustee in bankruptcy, where it was at the time heavily indebted, and there were no surplus profits or earnings out of which the dividend could be legally declared, and the party to whom the payment was made knew of its financial condition."

It has been uniformly held in California that a corporation may not ordinarily be authorized to purchase its own shares of stock since the result constitutes an illegal withdrawal and payment to stockholders of a part of the capital stock, contrary to the statutory provisions of law, and that the transaction is therefore *ultra vires.* (*Schulte* v. *Boulevard Gardens Land Co.,* 164 Cal. 464 [129 Pac. 582, Ann. Cas. 1914B, 1013, 44 L. R. A. (N. S.) 156]; *Stevens* v. *Boyes Hot Springs Co.,* 113 Cal. App. 479 [298 Pac. 508]; *Mancini* v. *Patrizi,* 87 Cal. App. 435 [262 Pac. 375]; *Wagg* v. *Toler,* 80 Cal. App. 501 [251 Pac. 973]; 7 Cal. Jur. 78, sec. 571; 4 Thompson on Corporations, 2d ed., 625, sec. 4076; 6 Fletcher's Cyc. of Corp., p. 752, sec. 2847.) In the Schulte case, *supra,* an order sustaining a demurrer on the part of the defendant corporation on the ground that the complaint failed to state facts sufficient to constitute a cause of action was reversed. It was alleged the corporation sold 20 shares of its stock accompanied by an agreement that "should the purchaser of said stock . . . wish to sell the same, we will repurchase it at par value, . . . " It was further alleged that: "At the time the contract was made and ever since, the defendant owned and owns surplus profits exceeding, by over fifty thousand dollars, the sum of the corporate debts. . . . The defendant could comply with its contract without injury to any creditor or stockholders." In spite of the fact that the stock could be repurchased by the corporation without harm to the creditors or stockholders, in effect the above-quoted agreement con-

temporaneous with the original sale of the stock, was held to be *ultra vires* and invalid. Construing the provisions of section 309, *supra,* as it then existed, the court said:

"The phrase 'capital stock', as used in this section, . . . has been construed in various decisions of this court. Its meaning has been definitely settled to be, not the shares of which the nominal capital is composed, but the actual capital, i. e., assets, with which the corporation carries on its corporate business." (Citing numerous cases.) "Although the prohibition runs, in terms, only against the directors, the effect of the section is to deprive the stockholders as well of power to do the forbidden acts. (*Kohl* v. *Lilienthal,* 81 Cal. 378, 385 [6 L. R. A. 520, 20 Pac. 401, 22 Pac. 689] ; *Burne* v. *Lee,* 156 Cal. 221, 222 [104 Pac. 438].)

"In other jurisdictions, the authorities show a sharp conflict over the question whether, in the absence of any statutory or charter restrictions, a corporation may employ its assets for the purchase of shares of its own stock. (Cook on Corporations, [6th ed.] sec. 311.) But in view of the code provisions to which we have referred, it cannot be doubted that, in this state, a corporation is not authorized to make such purchase, since the result would be to illegally withdraw, and pay to a stockholder a part of the 'capital stock'. (*Bank of San Luis Obispo* v. *Wickersham,* 99 Cal. 655, 661 [34 Pac. 444].) The want of power to buy its own stock does not prohibit a corporation from taking the stock in satisfaction of a loan, or when otherwise necessary to save itself from loss (*Ralston* v. *Bank of California,* 112 Cal. 208, 213 [44 Pac. 476]), but the general rule is, as above stated, that the purchase is unauthorized. Thus, this court has condemned, as a violation of section 309, a by-law assuming to give to any stockholder, the right upon sixty days' notice, to withdraw from the corporation, and to receive, upon surrender of his stock, the amount paid therefor. (*Vercoutere* v. *Golden State L. Co.,* 116 Cal. 410 [48 Pac. 375].)"

Under the preceding authority, the corporation in the present case was unauthorized to repurchase its own stock, regardless of whether it was then bankrupt, and the money which was paid to the bank therefor, with knowledge on its part of the inability of the corporation to purchase the stock, became a trust fund, subject to recovery by the trustee of the corporation in a proper suit.

Moreover, the respondent was prevented at the trial from showing that the corporation was insolvent, and that the stock could not be repurchased by it without loss to the creditors. Objections to evidence offered for that purpose by the respondent were sustained. The appellants may therefore not complain on appeal of a lack of evidence in that regard. Nor are the bank statements of the corporation conclusive, one of which statements was previously filed with the bank "for the purpose of procuring and establishing credit from time to time with you for our negotiable paper". They merely created a conflict of evidence, and the trial court had a right to disregard them under the circumstances.

The appellants contend that since the trustee in bankruptcy was in no better position than the creditors to reclaim the money expended by the corporation to repurchase its own stock, he is estopped from maintaining this suit for the reason that the record fails to show there were creditors of the corporation in existence at the time of the purchase, and that subsequent creditors are not in a position to complain of the transaction. (*Sargent* v. *Palace Cafe Co.*, 175 Cal. 737 [167 Pac. 146] ; *Scales* v. *Holje,* 41 Cal. App. 733 [183 Pac. 308].) In other words, it is asserted the trustee in bankruptcy could represent in this suit to recover the funds thus illegally expended only the existing creditors at the time of the purchase of stock, and that the evidence fails to show there were then any such creditors.

The court found that, "At all times alleged in plaintiff's amended complaint, there were creditors to whom the American Jobbers, Inc., a corporation, were indebted." Mr. Redmond testified that on September 16, 1933, a meeting of the creditors of the corporation was held, at which meeting there were present at least ten creditors of the American Jobbers, Inc. The cause appears to have been tried on the theory that it was immaterial whether there were creditors of the corporation prior to the purchase of the stock. At least our attention is not called to evidence regarding that issue, except that upon the objection of the appellants, plaintiff was precluded from showing the financial status of the corporation which necessarily included the proof of its existing indebtedness to creditors. Mr. Daley, the presi-

dent, was asked: "Q. If the corporation, the American Jobbers, preceding its becoming bankrupt, when it was declared bankrupt, if it had this $16,000 *would it have been financially in a position to meet its obligations?*" To this question the appellants objected on the ground that it was incompetent, irrelevant and immaterial. This objection was sustained. The appellants may, therefore, not complain that the plaintiff failed to show that the corporation could not then meet its obligations on account of debts which it owed to creditors.

Moreover, under the authorities in this state, it is immaterial whether creditors of the corporation existed at the time of the purchase of stock. It has been repeatedly held that a trustee in bankruptcy may maintain an action in behalf of any and all creditors to recover a trust fund belonging to the corporation which is created by an illegal purchase of its own stock without the consent of the corporation commissioner and contrary to law, for the reason that the transaction is *ultra vires* and void. (*Kahle* v. *Stephens,* 214 Cal. 89, 93 [4 Pac. (2d) 145]; *Dean* v. *Shingle,* 198 Cal. 652 [246 Pac. 1049, 46 A. L. R. 1156]; *Martin* v. *Zellerbach,* 38 Cal. 300, 311 [99 Am. Dec. 365]; 55 A. L. R., p. 116, note 4.) In the Kahle case, *supra,* it is said in that regard:

"The argument that the trustee cannot bring this action on behalf of creditors *whose claims were not in existence at the time of the fraud* is also without merit. . . . The trustee is a party authorized to sue on their behalf."

And regarding the same question, the Martin case, *supra,* says:

"As to all creditors of the company, *prior or subsequent,* it (the transaction) was simply void; and no reason has been suggested why a creditor who has in no way promoted the void act should be estopped from contesting it."

The Scales case, *supra,* relied upon by the appellants, may be distinguished from the present action. That was a suit by the trustee in bankruptcy of a corporation to recover money paid by the president of a one-man corporation to satisfy his personal debt to Holje. The question of the violation of sections 309 and 354 of the Civil Code, as they then existed, does not appear to have been involved in that suit. That cause involved only the misappropriation of cor-

poration funds by an officer thereof. The defendant in that suit, Holje, was not a creditor of the corporation. In the present suit the corporation purchased its own stock in violation of the statutory provisions above referred to, which rendered the transaction *ultra vires* and void. If it be deemed that the principle regarding the unlawful distribution of corporation assets for the benefit of stockholders contrary to the provisions of the statute was involved in the Scales case, then we must assume that decision was overruled by the later case of *Kahle* v. *Stephens, supra,* which appears to directly determine the point adversely to the appellants. There may be a conflict of authorities in other jurisdictions regarding that question (55 A. L. R., p. 116, note 4), but the Supreme Court of California has decided that the trustee in bankruptcy may maintain the action to recover money paid by a corporation to repurchase its own stock in violation of the statutory provisions in behalf of creditors thereof existing both before and after the illegal transaction is consummated.

Likewise, the Sargent case, *supra,* upon which the appellants rely, is distinguishable from the present action. That was not a suit by a trustee of a bankrupt corporation. Nor did it involve the purchase of stock by the corporation contrary to law. The syllabus of that case correctly states the issues involved therein, as follows:

"A promissory note issued by a corporation to one of its directors as part payment of the purchase price on a sale by him to one of the other directors of all the stock of the corporation except the two 'qualifying' shares is neither void nor voidable, where the directors are the only stockholders *and there are no adverse interests of creditors involved.*"

As between the identical parties who were involved in that transaction, since there were no creditors to complain, the corporation should be estopped from denying the validity of its own act. The last-mentioned case is not in conflict with what we have previously said regarding the right of a trustee in bankruptcy to maintain this suit in behalf of creditors existing either before or after the consummation of the sale.

This suit is not barred by the statute of limitations (sec. 338, subd. 4, Code Civ. Proc.), for the reason that

three years had not elapsed from the date of the sale of stock before the appointment and qualification of the trustee in bankruptcy occurred, and the suit was commenced immediately thereafter. Section 29, subdivision (d) of the National Bankruptcy Act (11 U. S. C. A., p. 381, sec. 29, subd. [d]) provides that "Suits shall not be brought by or against a trustee of a bankrupt estate subsequent to two years after the estate has been closed." It has been repeatedly determined by state and federal courts that the preceding provision of the Bankruptcy Act supersedes the limitation of time within which this class of equitable suits may be brought as prescribed by state statutes with relation thereto, and has the effect of extending or changing the time therefor to "two years after the estate has been closed." (*Isaacs* v. *Neece*, 75 Fed. (2d) 566; *Devoy* v. *Superior Fire Ins. Co.*, 239 App. Div. 28 [265 N. Y. Supp. 432]; 5 Remington on Bankruptcy, 3d ed., p. 402, sec. 2347; Black on Bankruptcy, 4th ed., p. 1064, secs. 865, 866; 1 Collier on Bankruptcy, p. 424.) The rule that the Federal Bankruptcy Act has the effect of extending the time within which a trustee may commence a suit under the circumstances of this case to two years after the closing of the bankrupt estate is announced in 5 Remington on Bankruptcy, *supra,* as follows:

"Suit may be commenced by the trustee upon any action that was not barred by limitation at the beginning of the bankruptcy, and may be so commenced at any time within the two years after the closing of the estate, notwithstanding the state statute of limitations may bar the action before the two years have expired. In short, the act creates a new statute of limitations, except as to actions already barred when the bankruptcy proceedings were instituted."

The preceding text applies to the facts of the present case. In this suit it appears the unlawful purchase of the bank stock occurred July 25, 1930. Within three years thereafter, to wit, on June 26, 1933, the trustee in bankruptcy was appointed, and qualified. This suit was commenced August 15, 1933. It was, therefore, not barred by the statute of limitations, even though it be conceded that, except for the controlling provisions of section 11d of the Federal Bankruptcy Act this case would have been barred by the provisions of section 338, subdivision 4, of the Code

of Civil Procedure of this state. In view of the authorities above cited, it is unnecessary for us to determine whether the running of the statute under the state law would have been tolled for failure to have discovered the fraud upon which the suit is based, or whether that lack of knowledge was properly pleaded and proved at the trial.

The Isaacs case, *supra,* was a suit in equity by a trustee in bankruptcy, similar to the present case, to cancel instruments as fraudulently and illegally made by the bankrupt, and to recover for the benefit of creditors money paid in redemption of stock. In that case the Circuit Court reviewed and distinguished many cases cited on the theory that they support a contrary doctrine. After citing numerous cases in support of its conclusions, the court said:

"All of these hold flatly that section 29 [11d of the Bankruptcy Act] provides a limitation period which supersedes all state statutes, and gives the trustee the time stated in it to sue. Two of these cases definitely decline to follow the Davis case. All hold that the effect of this section is the same as that of the corresponding section of the prior act, which was uniformly held to supersede all state statutes. . . .

"We think the trustee's position that section 29 fixes the time he may sue all causes of action not already barred when the bankruptcy proceedings were filed, furnishes a more reasonable, a more workable theory of limitation than the one advanced in the Davis and Drain cases, that it applies to some actions, but not to others."

Some of these adverse cases may be distinguished by the manner in which the suits arose, or by the fact that the question of the limitation of time for the commencement of an action pursuant to the Federal Bankruptcy Act was not involved or properly presented. The case of *Davis* v. *Willey,* 273 Fed. 397, upon which the appellants in this case chiefly rely, appears to be in point. But that case is specifically disapproved by the Supreme Court of New York in the case of *Devoy* v. *Superior Fire Ins. Co.,* 239 App. Div. 28 [265 N. Y. Supp. 432], in the following language:

"The foregoing weight of authority precludes adopting the contrary holding in *Davis* v. *Willey,* (C. C. A.) 273 Fed. 397, the reasoning of which defendant disavows."

We therefore conclude the present action is not barred by the statute of limitations.

Finally, the appellants assert that the judgment which was rendered against the bank on the theory that the contract of sale of stock was rescinded is in irreconcilable conflict with the judgment against Maulhardt, its agent, on the ground that the sale was procured by his fraud.

We are of the opinion there is no merit in this contention. The gist of this action is not based on the rescission of a contract which is deemed to be merely voidable. It is a suit to recover a trust fund held by the California Bank for the benefit of the creditors of American Jobbers, Inc., a bankrupt corporation. The theory of the pleadings, and of the trial unquestionably was that the California Bank, through its agent, Maulhardt, fraudulently and wrongfully induced the produce corporation by tortious representations to purchase 37 shares of its own stock in violation of sections 309 and 354 of the Civil Code, as the sections then existed; that the purported sale was therefore *ultra vires* and void *ab initio;* that the bank received the benefits of the illegal transaction and now retains the sum of $13,935.91 thus acquired, which it holds in trust for the creditors of the corporation. The judgment does not purport to rescind the sale. It merely declares that the plaintiff is entitled to judgment in the sum of $13,935.91, and interest against both defendants, and that the California Bank is entitled to a return of the 37 shares of stock. The court did find that the purported sale of stock was contrary to law and void. It also found that plaintiff was entitled "to rescind the transaction" upon return of the stock to the bank. Since the sale was void, it is not necessary to rescind the transaction. But that finding is immaterial and harmless. The transaction was in direct violation of the statute and therefore void in its entirety. It was in fact no sale at all. It was necessary only to allege and prove facts sufficient to show that the California Bank acquired the fund derived from the illegal sale of the stock under such circumstances that a trust fund was created to which the creditors of the bankrupt corporation are entitled. The codefendant, Maulhardt, became personally liable independently of the bank, for the reason that he procured the illegal sale of the stock

by means of fraudulent and tortious representations. The judgment is therefore not inconsistent. Both the principal and the agent are liable under the circumstances of this case.

Independently of the doctrine of agency, the California Bank is liable to account to the creditors of the produce corporation in the present case because it holds a trust fund belonging to the estate of the bankrupt estate which was acquired by a purported sale of stock, which sale was in direct violation of law and therefore void. The bank holds the funds as trustee for the real owners thereof, subject to the return of the stock. The return of the stock was tendered, and the judgment decrees the return of this stock to the bank.

It is conceded the bank was not an undisclosed principal in the transaction. It could not authorize its agent to sell stock of the produce corporation to the corporation itself because that was in violation of the statute. On the doctrine of ostensible agency the bank would be liable only under the circumstances stated in section 2334 of the Civil Code. But ostensible agency is not here involved. The bank did acquire the fund by means of tortious acts to which it was a party, to-wit, persuading the corporation to purchase its own stock in violation of the statute. It will be presumed to have knowledge of the illegal transaction for the bank held the 37 shares of stock and transferred them to the corporation in consideration of the payment of $16,000, the greater portion of which purchase price was loaned to the corporation by the bank, with which to consummate the illegal purchase. The bank itself took and held the corporation's promissory note for $12,000 representing that loan, with which the illegal purchase of stock was largely made. The bank must therefore be deemed to have had knowledge of the illegal transaction which renders it liable in this suit. The bank is not liable by merely ratifying the tortious acts of its agent where the purported sale is actually made in the name and for the benefit of the principal, for under such circumstances the third party actually gets what he bargains for, and the agent is thereby released from liability. (1 Mechem on Agency, 2d ed., p. 387, sec. 542.) But even under such circumstances, ''The principal, however, cannot retain the proceeds of the agent's

misrepresentation if the other party is willing to return what he has received." (1 Restatement of Law of Agency, p. 575, sec. 258c.)

But while the agent is ordinarily relieved of liability for tortious representations when the sale is openly made in the name and for the benefit of a disclosed principal, or when the principal ratifies the wrongful conduct of the agent, the agent is not relieved, but, on the contrary, may also be held liable, when the tortious acts are of such a nature that the principal could not legally authorize them, as was the fact in the present action.

In 1 Mechem on Agency, second edition, page 388, section 546, it is said in that regard:

"But where the act was one which the principal could not lawfully do or authorize, the case is different. Here while, by ratifying the tort committed by his agent *the principal becomes liable therefor, this is an additional liability and not a substituted one. The agent still remains liable to third persons and satisfaction may be demanded either of the principal or of the agent or of both.* It is no defense to one who is sued for committing a trespass to reply that he acted as the agent of another."

Under the circumstances of this case, Maulhardt was also personally liable for his tortious acts, independently and separately from the liability of the bank. ▆▆ Assuming that the responsibility of the principal and of the agent under the circumstances of this case is a separate and distinct liability, as above related, then the plaintiff could not be required to elect its remedy against either one or the other. Moreover, assuming, without so deciding, that an election of remedies against either the principal or the agent might have been enforced, that right was waived in the present action by failure on the part of the defendants to demand the election by demurrer, motion or otherwise. (*Klinger* v. *Modesto Fruit Co., Inc.,* 107 Cal. App. 97, 103 [290 Pac. 127]; *Craig* v. *Buckley,* 218 Cal. 78, 82 [21 Pac. (2d) 430].) The appellants may therefore not complain of a failure on the part of plaintiff to. elect with respect to its remedy as between the principal and the agent.

The judgment is affirmed.

Plummer, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 13, 1936, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 10, 1936.