[Sac. No. 5620.   In Bank.   Feb. 1, 1944.]

MARY ELLEN GRAY, as Administratrix, etc., Appellant, v. SOUTHERN PACIFIC COMPANY (a Corporation), Respondent.

· M. Mitchell Bourquin, Patrick J. Murphy and K. D. Robinson for Appellant.

T. L. Chamberlain and Jones & Quinn for Respondent.

CARTER, J.—Plaintiff appeals from a judgment for defendant notwithstanding the verdict of a jury awarding her damages in the sum of $15,000 in an action under the Federal Employers' Liability Act, (45 U.S.C.A., secs. 51-59) based upon the alleged negligence of defendant in the operation of its train resulting in the death of Pierce L. Gray.

The main issue presented is whether or not the evidence is sufficient to support the implied finding of the jury that the deceased met his death in the course of his employment as the result of defendant's negligence. Plaintiff's theory is that the deceased was knocked from the top of a box car while in the performance of his duties as a brakeman by the negligent stopping of the train without warning.

Defendant operates a railroad through Colfax, California. On the evening of April 10, 1934, the time of the accident, defendant was operating in interstate commerce a freight train consisting of two engines, sixty-two cars, and a caboose, en route easterly from Roseville, California, through Colfax to Sparks, Nevada. One engine was at the head of the train, and the other, a helper, four cars ahead of the caboose. The first thirty-five cars following the head locomotive were box cars. At Colfax the facilities for supplying the engines with water are located on the south side of the main track about 20 feet east of an express company shed which in turn is about 100 feet east of the depot. The train

arrived at Colfax at 9:45 at night; the weather was clear, the night was dark and it was dry and warm. In stopping to take on water, the lead engine was uncoupled and proceeded about 100 feet to the water column. The watering operations were completed, and at 10 p. m. the train pulled out of Colfax. After it had proceeded 40 to 50 car lengths and attained a speed of about eight miles per hour, it was brought to a stop by the engineer in the lead engine by the application of air throughout the train. The train traveled about 250 feet or about five car lengths from the time the air brakes were applied before it stopped. Following the stop, deceased was found dead, his head and left forearm having been severed from his body. His body was found at about the fortieth car from the head of the train; his forearm was found leaning against the inside of the south rail of the tracks under the thirty-fifth car. There thus were five cars between his body and arm, or the same distance that the train traveled from the time of the application of the brakes to the stop. From the leaning position of the forearm it is reasonable to infer that no wheel of the train passed over the place where the arm was lying after it reached that position inasmuch as the flange on the wheel would have moved it. From these circumstances it may be deduced that the deceased was at the thirty-fifth car from the head of the train at the time of the occurrence of the event that caused his death and it is probable that the deceased's arm had been dragged along by the thirty-fifth car until the train came to a full stop. Moreover, other circumstances place him at that point and also indicate that he had boarded the train. There were four brakemen on the train, one of whom, the head brakeman, was the deceased. At and before the time of the accident it was the deceased's duty to go upon and walk along and over moving freight cars. There is evidence that the custom or practice was for the head brakeman, under the circumstances presented, to inspect the first half, or the first thirty-four to thirty-five cars of the train from the ground as it rolled out of the station, giving special attention to whether the brakes were sticking on the wheels of any of the cars or whether any wheels were sliding. After the portion of the train subject to his inspection had rolled past, he would board the train, going on top of the cars to give or receive signals. It is wholly reasonable to conclude that on the occasion in question the decedent was performing

those duties, had inspected his portion of the train and boarded the thirty-fifth car. That conclusion is consistent with evidence which is susceptible of the interpretation that the maximum speed of eight miles per hour for a train pulling out of a station is designed to enable trainmen who are making a rolling inspection from the ground to board the train after completion of that duty. Also, the evidence shows that deceased was characterized as an excellent brakeman, always willing to do his part and was active and competent, hence, likely to be performing his duties. The foregoing circumstances are sufficient to place decedent on the thirty-fifth car and sustain the inference that he fell from that car. With reference to the presence of deceased on the train, without regard to the particular portion thereof, defendant admits in its answer that at the time of the accident deceased was on the top of one of the freight cars of the train in the course of his employment and that he was run over by the train. Thus, if the defendant was negligent in stopping the train and that negligence was the proximate cause of his death, there is sufficient evidence to support the verdict. The foregoing circumstances clearly furnish a basis for concluding that the stopping of the train was the cause of the accident, particularly the location of the body and the location and position of the forearm. They reasonably establish as a fact that the accident occurred while the train was in the process of stopping.

Defendant contends that the only substantial evidence supports its version of the accident, that is, that deceased fell before the stop from the top of the second or fourth car behind the lead engine while crossing without a lantern from one car to another en route to the engine and hence no asserted negligence of defendant in making the stop could have caused the accident. It points to evidence that when the train arrived in Colfax to take on water the deceased assisted in that operation by uncoupling and later coupling the lead engine; that he left a restaurant near the tracks when the train was starting and the engine crew testified that he boarded and moved to the top of the second or fourth car from the lead engine, having no lantern with him; that blood was found on the wheels of the second to fifth cars; that all the witnesses who qualifiedly testified on the subject established that the deceased's duties as head brakeman did not include a rolling inspection of the train and

that he was supposed to board and ride the lead engine when it left Colfax.

The most that can be said of such evidence is that it created a conflict in the evidence or involved the credibility of the witnesses or the weight of the evidence, all matters which were resolved against defendant by the jury and with which we are not concerned on appeal. ▮▮▮ In addition to the circumstances heretofore related as supporting the jury's verdict, there are other circumstances which mitigate against defendant's version of the accident. Although it was a dark night the weather was warm and dry and as far as appears the cars were in good condition. Deceased was a brakeman of many years' experience, was an alert, agile and able workman, and the tracks traversed were in good condition and decedent was familiar with them and the character of the train involved. All of these circumstances carry inferences which rebut the assumption that deceased fell when going from the top of one car to another without the intervention of any unusual occurrence.

It must be remembered that practically all of the witnesses were employees of the defendant and thus cannot be said to be disinterested witnesses. With reference to the duty of decedent to make a rolling inspection of the fore part of the train, it is true that several of defendant's employees testified that the head brakeman had no such duties at the time of the accident with respect to any part of the train. The jury could have disbelieved those witnesses. One of them testified that there was no rule prohibiting a head brakeman from riding on top of the train, that is, that it was not mandatory that he ride in the cab of the engine. Another stated it was up to the brakeman whether he rode on top of the train rather than in the engine cab. The conductor on the train testified that he observed a brakeman near the head of the train when it was moving out and a rolling inspection was made. He stated that it was Hatch, another brakeman, not Gray. But although Hatch stated on direct examination that he had made a rolling inspection of the whole train, his testimony in this regard was substantially impeached by inferences which may be drawn from other evidence. From his testimony on direct examination it may be inferred that he stood or squatted in one spot near the rails and watched the wheels of every car of the entire train

as it passed him. But it is established that the train comprised two engines, 62 cars and the caboose, that it had rolled only 40 to 50 car lengths when the airbrakes were suddenly applied for the irregular stop, and that it rolled only about five car lengths more before its complete stop. Therefore, from 45 to 55 car lengths was as far as the train moved at the time in question. It did not move its entire length. At least seven cars plus the helper engine plus the caboose had not yet passed Hatch when the train had come to a full stop if he started his inspection at the first car. But he said he boarded the caboose and that this was done while the train was still in motion. If that part of his testimony is true then it seems to be a reasonable inference that he was not the brakeman who inspected the front part of the train. It is therefore reasonable to conclude that the brakeman making the rolling inspection of the fore part of the train was deceased, not Hatch, the other members of the crew being otherwise engaged. ▪ Plaintiff produced a witness Wait, whose credibility is vigorously attacked by defendant, who testified with regard to the duties of a head brakeman such as deceased to make a rolling inspection under the given circumstances. His testimony cannot be said to have been destroyed. He was a former railroad man of many years' experience as a brakeman and otherwise, and had experience prior to the date of the accident on the run here in question, having been an employee of defendant. He testified that it was the practice and custom for the head brakeman to make a rolling inspection under the circumstances here presented prior to 1930, four years before the accident. Defendant's fireman on the lead engine testified that the practice had remained the same during many years prior to 1930 and thereafter. However, his view of the practice was contrary to Wait's. The question of credibility was for the jury and it is unnecessary to discuss in detail the various attacks upon it made by defendant. It is contended, however, that it was improperly admitted because there was no foundation laid establishing that the practice was the same in 1930 as in 1934, the date of the accident; that the fireman's testimony was insufficient in that respect because he testified to a contrary custom. ▪ Generally, the respondent may not be heard on appeal to complain of the improper admission of evidence. (See 2 Cal.Jur. 839-840.) ▪ Nevertheless, we believe that the evidence was admissible and relevant under the circum-

stances in the instant case. Wait had many years' railroad experience and had experience as a brakeman in the operation of trains at the place involved in the instant action. Although the fireman testified that the practice imposed no duty of rolling inspection on the head brakeman, he also testified: "Q. Then you may be understood to say that the practice in 1934 was the same as '33, '32, '29, right on back through your experience? A. Yes, sir. Q. *Whatever it was,* it was the same? A. Yes sir." (Emphasis added.) The jury could have disregarded the fireman's testimony as to the exact practice, and accepted the part that it was the same prior to 1930 as it was at the time of the accident. Moreover, the written rules of the company may be interpreted as consistent with the requirement that brakemen generally, not referring to any particular one, are required to make a rolling inspection and pass signals. The rules limit the speed of trains to eight miles per hour for a distance to permit a rolling inspection and each trainman is responsible for the wheels of the portion of the train under his charge. Trainmen must be so distributed over the train "as to control it most effectively." The fireman testified that it is a brakeman's duty to be in a position to pass signals while a train is in motion.

In regard to the location and position of decedent's arm in relation to the thirty-fifth car and the presence of decedent's body at the fortieth car from the head of the train, the evidence referred to by defendant does nothing more than create a conflict. Although there may be some conflict in the fireman's testimony or uncertainty in its meaning, he testified that he walked back from the lead engine along the south side of the train 15 to 20 cars, then seeing a lantern on the north side crossed over and continued to the Standard Oil crossing, where he found the arm. He then stated, which in the light of his foregoing testimony may be said to mean, that the arm and the Standard Oil crossing were at the thirty-fifth car from the engine: "Q. Did you then walk back to the Standard Oil Crossing? A. Yes. Q. It was then that you found the arm of Pierce Gray? A. Yes sir. Q. How many cars was that back from the Standard Oil Crossing? A. I should judge about 35." That interpretation is further fortified by the fireman's testimony that he did not proceed beyond the Standard Oil crossing, but returned to

the lead engine after finding the arm. Moreover, there is evidence that the helper engine, when the train was stopped, was on the Grass Valley grade crossing, and with it in that position, considering the make-up of the train and the distance between the Standard Oil crossing, where the arm was found, and the Grass Valley crossing, the thirty-fifth car would be resting at the former crossing. The position of the arm with respect to the south rail of the track, that position being such that no wheel of the car could have passed by it without moving it is clearly shown by the evidence. The conductor testified at the trial that the "arm was laying up on the, on this fill, up against the right rail of the number two track, that is the main line track. Q. Which rail was that, the right rail? A. The right rail, yes sir." He was called as plaintiff's witness and was impeached because of surprise by plaintiff by his testimony at the coroner's inquest. Nevertheless, he admitted he testified at the inquest: " 'Do you recall which arm and hand was found at the crossing? A. I believe it was the left. Q. That was found in between the rails, was it? A. Yes, leaning up against the right rail.' Did you so testify at the coroner's inquest? A. I believe I did, yes. . . . Mr. Bourquin: Q. Will you answer, Mr. Lytle, was that true, when you gave that testimony at the inquest? A. I told it for the truth, yes sir." The fireman testified: "Q. Whereabouts was the arm that you saw with respect to the rails upon which you were travelling? A. It was on the south rail, just inside where the flange tread, laying up against the rail where the flange tread was." That testimony was clearly susceptible of the interpretation by the jury that the arm was in the position heretofore described. There is conflicting evidence by the same witness on the subject, but its credibility and the conclusion to be drawn therefrom was for the jury.

The evidence of blood spots on the wheels heretofore referred to is asserted as substantiating defendant's theory and completely refuting plaintiff's version. The spots claimed to have been discovered by the conductor on his first inspection of the fifth car were very small and a later inspection was not made until after the train reached Nevada. Defendant also calls attention to the fact that Gray's lantern was not found, but this was another circumstance for the jury to consider in the determination of the issues of fact.

In determining the disputed questions of fact pre-

sented at the trial of the case it was the province of the jury to disbelieve any testimony which appeared to them to lack verity. They were the exclusive judges of the credibility of the witnesses and the weight to be given their testimony. They could reject positive testimony and accept circumstantial evidence as proof of the facts, as it is elementary that direct evidence may be disbelieved and contrary circumstantial evidence relied upon to support a verdict or finding. (*Barham* v. *Widing*, 210 Cal. 206 [291 P. 173]; *Parsons* v. *Easton*, 184 Cal. 764 [195 P. 419].)

The foregoing discussion has to do with the manner and place in which the deceased met his death. There is evidence from which an inference may be drawn that he was on the thirty-fifth car, and that he fell therefrom some time between the application of the brakes and the stop, and that there was a definite link of causation between the stop and the fall. It remains then to determine whether or not defendant was negligent in making the stop, and hence liable. There is considerable discussion in regard to whether the stop was unusual. It is defendant's claim that the stop was made to ascertain the whereabouts of the deceased. There is evidence that such a stop was not a common occurrence and certainly it was not to be expected at least as far as the deceased was concerned. There is nothing to indicate that he was aware that a stop was going to be made. The stop was not for any emergency. The block signal showed a clear track ahead. The engineer testified that: "Q. Gave you a clear signal, and you got a clear signal from the block signal? A. Yes. Q. In other words from the time you passed the block signal, you had no reason to expect any necessity to stop, is that the idea? A. Yes." Hatch, a brakeman, testified: "Q. Mr. Hatch, you boarded the train leaving Colfax on the caboose, is that right? A. What is that? Q. When the train started up at Colfax, did you board on the caboose? A. Yes. . . . Q. Mr. Hatch, after the train had stopped at Colfax and taken water and made preparations to leave, you, as brakeman, didn't expect that any stop would be made pulling out of there, did you? A. No, not ordinarily. . . . Q. Mr. Hatch, the fact that a train did stop at the place this was brought to a stop, leaving Colfax that night after the train had stopped at Colfax and taken water

and prepared to move on, was an unusual thing, wasn't it? A. Yes, ordinarily, it was.'' No notice or warning of the stop was given. A rule of the defendant referring to the various whistle signals indicates a short blast ''apply brakes, stop.'' One of the crew testified that that meant: ''Long, short blast of the whistle sounded by the engineer, signifying to the trainmen that he wants help to stop the train with, that for some reason that the air brakes on the train have come partially or wholly in-operative, and that he is not able to control the speed of the train, or to stop the train as he wants to, and needs help.'' While the reference is to assistance in stopping the train, nevertheless it would also serve as a warning that a stop was to be made. The engineer on the helper engine stated that one short blast of the whistle on the lead engine means a stop and indicates the intention of the engineer to stop the train. Wait testified that he was familiar with the above mentioned rule and that upon a short blast of the whistle the train crew prepared for a stop. Defendant admitted in its answer that decedent was in the course of his duties on top of the train at the time of the accident, and as we have seen according to its version he was on the fourth car when the train started. In view of the custom and practice requiring the deceased to make a rolling inspection of the train and board about the thirty-fifth car, the engineer in the lead engine should have known that the deceased in the course of his duties was on top of the train at the time it was stopped. Those circumstances also negative the reason advanced by the engineer for the stop, that is, that it was due to the absence of deceased from the cab of the lead engine. While there is evidence by several witnesses that the stop was gradual and easy and without a jerk in the cars there are circumstances from which the jury could have inferred that the stop would probably have caused some jolting. Before the stop practically all of the slack between the cars had been taken up. Although there is evidence that the proper application of the air brakes throughout the train results in a uniform braking to avoid jerking, the element of the slack resulting from stopping is an element to be considered. An application of air at a slow speed creates a greater shock than at high speed. The train was traveling about eight miles per hour. The helper engine four cars ahead of the caboose was pushing forward to some extent. There is evidence that a slight rather than a proper application of

air throughout the train as well as an independent application in the lead engine alone would cause a jolting and jerking. The flagman in the caboose testified that the stop was smooth without any jerking, but he also stated that the brakes were set up lightly and gently. Deceased was an able and active brakeman not likely to fall from the top of the car unless something unusual happened. Wait, a brakeman and conductor of many years' experience, including experience on the run here involved, testified as an expert: "Q. Mr. Wait, what would be the action upon a car in the middle of a 62 car train moving out from the stop at Colfax not faster than eight miles an hour, with the slack stretched out for a considerable distance behind the leading engine, and with the helper engine pushing slightly, working steam, if that train were brought to a stop within five car lengths, or 250 feet, by *any* application or use of the automatic air throughout the train? . . . A. It would be an awful jar, I'll tell you. It would be enough to throw a man from a box car, knock his feet out from under him. Mr. Jones: We move to strike out everything after the words 'it would be an awful jar'; the rest of it is going into the realm of speculation and conclusion again. The Court: Very well, it may go out." (Emphasis added.) From the foregoing evidence it is clear that it could be concluded that defendant was negligent in the process of making the stop and that that negligence caused the death of decedent.

██ Defendant asserts, however, that the foregoing testimony of Wait cannot be considered by this court. Clearly Wait was qualified to testify as an expert from his many years' experience. The matter concerning which he testified was a proper subject for expert testimony. It is said in *Peters* v. *Southern Pacific Co.*, 160 Cal. 48, 66 [116 P. 400]: "The management and operation of trains is a matter outside the experience and knowledge of ordinary jurors, and it is, therefore, a proper subject for expert testimony." This court held in the recent case of *Newkirk* v. *Los Angeles Junction Ry. Co.*, 21 Cal.2d 308 [131 P.2d 535], that the effect a loose condition would have upon the operation of a brake on a train was the proper subject of expert testimony. The question put to Wait included sufficient facts which were established upon which to base his opinion. It does not appear that the brakes on the train in 1934, the date of the

accident, were any different from those in use during Wait's experience prior to 1930.

■ Upon defendant's motion the foregoing testimony of Wait was stricken from the record. Nevertheless, defenant is not now in a position to complain of its consideration on this appeal in support of the verdict. A party may not object to a judgment against him because of insufficient evidentiary support where such lack arose as the result of the improper exclusion of evidence at his instance. It is so held where one party appeals from a judgment urging insufficiency of the evidence to support it. If the evidence necessary to support the judgment was erroneously excluded at the instance of appellant the judgment will be nevertheless affirmed. (*Kelso* v. *Slosburg,* 120 Cal.App. 479 [8 P.2d 158]; *Crinella* v. *Northwestern Pac. R. R. Co.,* 85 Cal.App. 440 [259 P. 774]; *Truschel* v. *Rex Amusement Co.,* 102 W. Va. 215 [136 S.E. 30]; *Missouri, K. & T. Ry. Co.* v. *Elliott,* 102 F. 96 [42 C.C.A. 188]; see 3 Am.Jur. Appeal & Error, sec. 879; 5 C.J.S. Appeal & Error, sec. 1506; 2 Cal.Jur. 846-847; *Chamberlain Co.* v. *Allis-Chalmers Mfg. Co.,* 51 Cal.App.2d 520 [125 P.2d 113]; *Martin* v. *Postal Union Life Ins. Co.,* 16 Cal.App.2d 570 [61 P.2d 333]; *Hansen* v. *California Bank,* 17 Cal.App.2d 80 [61 P.2d 794]; *Ralph* v. *Anderson,* 187 Cal. 45 [200 P. 940]; *Wells* v. *Zenz,* 83 Cal. App. 137 [256 P. 484]; *Credit C. Bureau* v. *Guaranty L. Co.,* 61 Cal.App. 528 [215 P. 104]; *Harp* v. *Harp,* 136 Cal. 421 [69 P. 28].) ■ Under the circumstances we think it is clear that the jury was justified in concluding that defendant was negligent and that its negligence was the proximate cause of the accident.

On January 17, 1944, the Supreme Court of the United States rendered its decision in the case of *Tennant* v. *Peoria and Pekin Union Railway Company,* in which decision the function of the court and jury in the trial of a case arising under the Federal Employers' Liability Act is discussed. The court said:

"In order to recover under the Federal Employers' Liability Act, it was incumbent upon petitioner to prove that respondent was negligent and that such negligence was the proximate cause in whole or in part of the fatal accident. (*Tiller* v. *Atlantic Coast Line R. Co.,* 318 U.S. 54, 67 [63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967].) Petitioner was required to present probative facts from which the negligence

and the causal relation could reasonably be inferred. 'The essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.' (*Galloway* v. *United States,* 319 U.S. 372, 395 [63 S.Ct. 1077, 87 L.Ed. 1458]; *Atchison, Topeka & Santa Fe R. Co.* v. *Toops,* 281 U.S. 351 [50 S.Ct. 281, 74 L.Ed. 896].) If that requirement is met, as we believe it was in this case, the issues may properly be presented to the jury. No court is then justified in substituting its conclusions for those of the twelve jurors. . . .

"The court below erred, however, in holding that there was not sufficient proof to support the charge that respondent's negligence in failing to ring the bell was the proximate cause of Tennant's death. The absence of eyewitnesses was not decisive. There was testimony that his duties included staying near the north or rear end of the engine as it made its backward movement out of track B-28. The location of his severed hand, cap, lantern and the pool of blood was strong evidence that he was killed approximately at the point where the engine began this backward movement and where he might have been located in the performance of his duties. To this evidence must be added the presumption that the deceased was actually engaged in the performance of those duties and exercised due care for his own safety at the time of his death. (*Looney* v. *Metropolitan R. Co.,* 200 U.S. 480, 488 [26 S.Ct. 303, 50 L.Ed. 564]; *Atchison, Topeka & Santa Fe R. Co.* v. *Toops, supra,* 356; *New Aetna Portland Cement Co.* v. *Hatt,* 231 F. 611, 617 [145 C.C.A. 497].) In addition, the evidence relating to the rule and custom of ringing a bell 'when an engine is about to move' warranted a finding that Tennant was entitled to rely on such a warning under these circumstances. The ultimate inference that Tennant would not have been killed but for the failure to warn him is therefore supportable. The ringing of the bell might well have saved his life. The jury could thus find that respondent was liable 'for . . . death resulting in whole or in part from the negligence of any of the . . . employees.'

"In holding that there was no evidence upon which to base the jury's inference as to causation, the court below emphasized other inferences which are suggested by the conflicting evidence. Thus it was said to be unreasonable to

assume that Tennant was standing on the track north of the engine in the performance of his duties. It seemed more probable to the court that he seated himself on the footboard of the engine and fell asleep. Or he may have walked back unnoticed to a point south of the engine and been killed while trying to climb through the cars to the other side of the track. These and other possibilities suggested by diligent counsel for respondent all suffer from the same lack of direct proof as characterizes the one adopted by the jury. But to the extent that they involve a disobedience of duty by Tennant no presumption in their favor exists. Nor can any possible assumption of risk or contributory negligence on Tennant's part be presumed in order to negate an inference that death was due to respondent's negligence.

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. (*Washington & Georgetown R. Co.* v. *McDade*, 135 U.S. 554, 571, 572 [10 S.Ct. 1044, 34 L.Ed. 235]; *Tiller* v. *Atlantic Coast Line R. Co.*, supra, 68; *Bailey* v. *Central Vermont Ry.*, 319 U.S. 350, 353, 354 [63 S.Ct. 1062, 87 L.Ed. 1444].) That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

"Upon an examination of the record we cannot say that the inference drawn by this jury that respondent's negligence caused the fatal accident is without support in the evidence. Thus to enter a judgment for respondent notwithstanding the verdict is to deprive petitioner of the right to a jury trial. No reason is apparent why we should abdicate our duty to protect and guard that right in this case. . We accord-

ingly reverse the judgment of the court below and remand the case to it for further proceedings not inconsistent with this opinion.''

The judgment is reversed and the court below is instructed to enter judgment on the verdict.

Gibson, C. J., Shenk, J., Curtis, J., and Schauer, J., concurred.

TRAYNOR, J., Dissenting.—It is my opinion that the evidence is insufficient to warrant a finding by a reasonable jury that it is more probable than not that the deceased met his death in the course of his employment as the result of defendant's negligence.