[Civ. No. 9942. First Appellate District, Division Two.—March 3, 1936.]

JOSEPH PAPINI et al., Respondents, v. ALEXANDER SANITARIUM, INC. (a Corporation), et al., Appellants.

Ross & Ross for Appellants.

Francis N. Foley for Respondents.

NOURSE, P. J.—The plaintiffs sued for damages resulting from the death of their son, Joseph Papini, and had a verdict for $3,500. The defendants appeal from the judgment on the verdict raising two points—that the evidence is insufficient to show negligence on their part, and that the verdict is excessive.

The record discloses a complete failure of proof in both instances. The action was founded on the theory that the defendants, who conduct a private sanitarium for nervous diseases at Belmont, were negligent in their supervision of a patient named Boliva, and that because of such negligence, Boliva attacked Joseph Papini with a razor blade and a table fork inflicting upon him wounds from which he died. The charges of negligence are found in the fifth and sixth paragraphs of the complaint. They allege that Boliva was by the Superior Court in San Francisco "duly adjudged dangerously insane", and was "committed" to the defendants' sanitarium, and that the defendants knew that he was suffering from a "form of insanity known as homicidal mania" and that unless restrained might at any time violently attack other patients, and that he had "on previous occasions attacked other persons and was a dangerous person to be at large or unrestrained". In paragraph six it was alleged that by reason of the carelessness and negligence of the defendants in failing to protect Joseph Papini from "the homicidal tendencies and mania and attack" of Boliva, the latter on the 24th day of December "procured a razor blade and a table fork and then and there attacked said Joseph Henry Papini" inflicting upon him wounds from which death proximately resulted on the 3d day of January, 1934. ■ The undis-

puted evidence not only fails to prove these material allegations of the complaint, but in almost every instance it completely disproves them.

The facts disclosed by the evidence are that Boliva had been injured in the course of his employment and was seeking compensation before the state industrial accident commission While these proceedings were pending, physicians in charge of the case recommended that he be placed in the defendants' sanitarium, and be permitted to freely mingle with the other patients. This was done with full knowledge and sanction of his guardian and the physicians in charge. In the month of November, 1933, he was called before the industrial accident commission for further hearing, and at that time assaulted the attorney for the insurance carrier. Testimony was offered that this assault was deliberately provoked by the attorney for the purpose of instituting insanity proceedings against Boliva, but this was denied by the attorney when called as a witness in this case. The undisputed evidence is that Boliva became angered at the conduct of the attorney and that immediately after the assault the latter filed a charge in the Superior Court of San Francisco and endeavored to have Boliva adjudged insane. The only portion of those proceedings which appears in the record is the judgment ordering that Boliva be ''discharged from custody''. Evidence was offered that his guardian thereafter returned him to the sanitarium with instructions that the judge in the insanity proceedings had ordered that he be paroled in the custody of his guardian and that the sanitarium was directed to place him under constant guard. The bailiff of the court in the insanity proceedings testified to conversations which he had had with the judge in the insanity proceedings relative to what should be done in regard to his care and custody after he had been discharged. The incompetency of all this testimony is so apparent that no further comment is required, but the only testimony offered, both competent and incompetent, completely disproves plaintiffs' allegation that Boliva had been ''duly adjudged dangerously insane''. There is no evidence that he was ''committed'' to the sanitarium. The only evidence is that he was taken there by his guardian and that the cost of his maintenance was paid by his insurance carrier. There is no evidence of any character that any of the defendants knew that he was suffering from any form of insanity

known as "homicidal mania" and no evidence that the patient had that disease or that he was suffering from any disease other than amnesia, which is a loss of memory. There is no evidence that the defendants knew that unless restrained he might violently attack other patients, or that they knew that he had attacked other persons on previous occasions, or that he was a dangerous person to be at large or unrestrained. The only evidence as to the knowledge of the defendants of a previous attack is that they had information from his guardian and from Boliva himself that the assault committed at the hearing before the industrial accident commission was provoked by the party assaulted. There is no evidence that they knew or had any reason to believe that this claim of justification was disputed until the witness testified in this case. There is no evidence that the defendants carelessly or negligently allowed Boliva to wander through the sanitarium unrestrained or that they did anything other than a reasonable person would have done under similar circumstances with the information which they had of the mental condition of the particular patient. The undisputed evidence is that he came to the sanitarium as an "amnesia" patient only. If he was "dangerously insane" the lunacy commission and the insanity court found to the contrary, and the defendants could not be charged with knowledge of what did not exist.

Coming to the allegations of paragraph six, there is no evidence that Boliva procured a razor blade or that he used a razor blade in an attack upon Papini, and there is not a particle of evidence to prove that Boliva attacked Papini with a razor blade, a table fork or in any manner whatsoever. The only facts proved are that Boliva, Papini and another patient were eating their lunch in the men's sitting room, that some of the attendants heard a scream, and Papini was seen coming out of the room with a cut on his neck. Attendants entered the room where the three patients had been eating, and found Boliva with a table fork in his hand. From this the plaintiffs assume that Boliva attacked Papini and caused the injuries complained of. The only possible theory upon which this assumption could be based is that an inference might be drawn from the fact that Boliva had a table fork in his hand immediately after the injuries were inflicted, but this inference would be immediately dispelled by the presumption that a criminal attack was not committed. If inferences are to be

indulged in, it is just as reasonable to infer from the evidence that Papini had often threatened suicide, that these wounds were self-inflicted. Aside from all inferences and presumptions, it was necessary for the plaintiffs to prove that the assault was made as they alleged, and that it was not provoked by the conduct of the patient.

■ The award of damages is without any evidentiary support. Papini was 35 years of age, his father 75 and his mother 56. He had suffered with hemophilia since he was four years old. The plaintiffs owned a fruit ranch at Coloma, and their son helped them about the ranch until September 3, 1931, when he was taken to defendants' sanitarium for treatment for his mental condition. Because of his physical ailment he was unable to do any hard work, and had already passed the period of life expectancy of patients of that type. His left leg was stiff and could not be bent at the knee; his left hip and elbow were stiff and could be used only with great difficulty. These conditions arose from internal bleeding and were pronounced incurable. He was constantly under the care of the physician at the sanitarium because of bleeding from superficial wounds caused by a scratch or the use of a razor. The physician in charge endeavored to get him interested in light work in the garden, but the patient after working two hours suffered an internal hemorrhage in his knee joints, and was unable to do any work of any character during his long stay at the institution. Physicians in active charge and observation of the patient testified that his physical condition was incurable, and that his mental condition had not improved during the period from September 3, 1931, to January 1, 1934. Lay witnesses testified that they had seen him on Thanksgiving and Christmas days during his confinement when he was taken to their homes by an attendant at the hospital. Their evidence seems to be that he was normal mentally, and the sister of the deceased consulted the physician in charge some time during the spring of 1932 and obtained his permission to put her brother in a private home. From this it is argued that the physician at that time held the opinion that the patient was cured mentally, but the facts are that she did not remove him from the sanitarium, and that all those who were competent to express an opinion as to his mental condition testified that it had not improved during his stay in the institution, but that he did have lucid in-

tervals which indicated a slight improvement for short periods during their observation. The medical testimony discloses that few victims of hemophilia live beyond their twenty-second year. All the expert witnesses agreed that this patient had lived beyond the period of expectancy, and that he might die because of his ailment at any time. All witnesses agreed that he was unable to do any manual labor of any consequence, and that an internal hemorrhage might be expected from a slight jar or overexertion. The plaintiffs did not take the stand as witnesses, and offered no evidence of any character tending to show the earning capacity of the deceased— what he contributed to them in the past or what he might be expected to contribute in the future. For the two years that he had remained in the sanitarium, the entire expense for the care and maintenance had been paid by his sister, and all the evidence unmistakably shows that if he had returned to his parents, he would have been a financial burden to them. There is, however, no evidence of any character tending to show what, if any, damage the plaintiffs have suffered. In this respect the case is controlled by *Parsons* v. *Easton,* 184 Cal. 764, 770 [195 Pac. 419], where the court approved the rule stated in 17 Corpus Juris, 1331, reading, ''When the action is by a parent for the death of an adult son, substantial damages are recoverable only by showing that the deceased had been of actual pecuniary benefit to his parent, or that such benefit might be reasonably expected by the continuance of his life, the reasonable character of such expectation to appear from the facts in evidence, such as, for instance, the age of deceased, his wages, habits as to economy, and amount of help given by deceased to his parent.''

The judgment is reversed.

Sturtevant, J., and Spence, J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 30, 1936.