[L. A. No. 19364. In Bank. Aug. 31, 1945.]

FLORENCE MARGARET WOOD, Appellant, v. SAMARITAN INSTITUTION, INCORPORATED (a Corporation), Respondent.

F. Murray Keslar for Appellant.

Chas. E. R. Fulcher for Respondent.

SCHAUER, J.—Plaintiff appeals from a judgment for defendant entered upon a verdict directed by the court after plaintiff had rested following presentation of her evidence in this action to recover for injuries suffered by her when she fell or jumped through a second-floor window of the

sanitarium conducted by defendant for the cure of chronic alcoholics. In her complaint plaintiff charges that defendant was negligent in failing to guard and restrain her and in failing to properly guard or bar the window of her second-story room to prevent her plunging through the window to the ground below. Plaintiff contends, among other things, that her evidence constituted a prima facie showing of negligence by defendant, entitling plaintiff to have the case go to the jury. Such contention must be sustained.

According to established principles it is our duty, in determining an appeal from a judgment entered on a directed verdict, to consider only the evidence most favorable to plaintiff, together with every inference which can reasonably be drawn and every presumption which can fairly be deemed to arise therefrom in support of plaintiff. (See *Anthony* v. *Hobbie* (1945), 25 Cal.2d 814, 817 [155 P.2d 826]; *Lashley* v. *Koerber* (1945), *ante,* pp. 83, 84 [156 P.2d 441].)

From the evidence it appears that for several years prior to January 5, 1943, plaintiff had been addicted to the excessive use of intoxicating liquor, and that on such date, between the hours of 9 and 9:30 o'clock in the evening, she voluntarily entered defendant's sanitarium to submit herself to treatment. Nursing attendance is maintained in the sanitarium for twenty-four hours each day. Mrs. Nellie Henke, a practical nurse who was on duty as an employe of defendant sanitarium between the hours of 4 p. m. and 12 midnight, testified that at the time of plaintiff's entry plaintiff "sort of seemed drowsy . . . I thought myself she carried on. . . . She was highly nervous and she told me she was afraid she was in the insane asylum." When Mrs. Henke came back on duty the following afternoon plaintiff "said she believed she felt a little better and she seemed brighter at the time, but later on she had delusions and carried on all evening. . . . She would talk about them. She thought she was in the insane asylum. She wanted to get out because she thought she was in the insane asylum." The witness reported these facts to the nurses from whom she received her instructions but they did not "tell me to do anything at that time." Later the same evening the witness found plaintiff "on the floor. She thought she was home scrubbing her floor and I had an awful time convincing her she was not, and I finally got her up in bed." The witness then explained to the nurses how plaintiff "was acting"

850

and the subject of placing restraints on plaintiff was discussed. However, "they said the next shift [which came on at midnight] would take care of it." Before the witness went off duty she discussed with the nurse who came on duty at midnight "about her [plaintiff] being on the floor scrubbing and they came on and I went home." However, no restraints were placed upon plaintiff, and at 12:45 a. m. on January 7, 1943, she was found lying on the cement courtyard beneath the window of her second-story room, suffering from the injuries for which she now seeks recovery.

From other evidence it appears that during the approximately twenty-seven hours that plaintiff had been in the sanitarium she had, pursuant to orders of a physician employed by defendant, received treatment consisting of the administration hypodermically of certain drugs and chemicals and the drinking of various intoxicating liquors, and that on January 6, 1943, and prior to the time plaintiff received her injuries, such physician had ordered for plaintiff "Nourish—Sedatives—Restraint PRN," which abbreviation, he stated, means "as the occasion requires." He further testified, "I think the nurse would be justified in putting on restraint if the patients were injuring themselves or attempting to. . . . I recall I wanted her placed in restraint for her own protection." The physician testified also that he had never seen "A confirmed alcoholic mind" that followed "a normal pattern. . . . You cannot determine what an alcoholic will do from one time to another," that you cannot "determine in advance what action" an alcoholic "person is going to take," that in defendant's sanitarium persons with delusions were not always put under restraint, and that restraint was used only when a patient's delusions "indicate a desire to injure someone else" or for the patient's "own protection." On the chart upon which the sanitarium recorded plaintiff's condition appears the following notation under date of January 5: "4:30 a. m. Patient delusional—persecution complex."

Mrs. Henke testified further that there were three large windows in plaintiff's room with double screens that "pull together" and could be pushed "back and forth." The screens were "closed . . . on the outside" but "together in the center." They overlapped and were locked on each side of the window. When so locked they could not be moved "unless

you pushed them out." The windows were open and "hanging loose."

Plaintiff's sister testified that she visited plaintiff at defendant's sanitarium for about forty-five minutes during the afternoon of January 6, 1943, but plaintiff failed to recognize her and "just laid there with the covers up to her neck and she was staring at the ceiling, and I spoke and she didn't look one way or the other; just stared all the time." This witness testified also that there were no nurses in sight on either the first or the second floor when she entered the sanitarium and it was necessary for her to find her way alone to plaintiff's room; that during her forty-five-minute visit to plaintiff only one nurse entered plaintiff's room and such nurse remained for "about two minutes" and then left and did not reappear.

Dr. Homer O. Zumwalt, an osteopathic physician and surgeon, licensed and practicing in this state since 1930, experienced in the methods of treating alcoholics at the various hospitals in Los Angeles and acquainted with the kinds and types of restraints that are used on various alcoholic patients and of the nursing conditions required in the various institutions in which alcoholics are treated, testified as follows: "Any patient who is in a mental condition to make him or herself dangerous to themselves or to others, should be in some way restrained. . . . [Q.] As I understand it, if they are dangerous because of their mental aberrations and apt to do injury to themselves or any other person, then they should be put in restraint? A. They should be protected, yes . . . [Q.] It is only those persons who have a tendency to injure themselves or somebody else that should be placed under restraint ordinarily; isn't that the test? A. I would add to that the qualification that they would be a patient that might be afraid to injure themselves or someone else."

As stated in 41 Corpus Juris Secundum 349, section 8(3), "The extent and character of the care that a hospital owes its patients depends on the circumstances of each particular case. A private hospital owes its patients the duty of protection, and must exercise such reasonable care toward a patient as his known condition may require. The measure of duty of a hospital is to exercise that degree of care, skill and diligence used by hospitals generally in that community, and required by the express or implied contract of the under-

taking. A hospital is liable for want of ordinary care, whether from incompetency of a nurse or failure in duty by a fully qualified nurse. . . . The duty of care imposed on a hospital extends to safeguarding the patient from dangers due to mental incapacity. . . . On the other hand, a private hospital is not an insurer of a patient's safety, and the rules as to care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen.''

Despite the above epitomized evidence defendant argues that no showing was made by plaintiff from which a jury could justifiably conclude that plaintiff was in a condition in which she might reasonably be expected by defendant to do harm to herself or to another, and that therefore the court correctly instructed the jury that defendant was not liable to plaintiff for the injuries she has sustained. However, it appears to us that plaintiff's evidence if believed by a jury is not as a matter of law insufficient to establish that plaintiff, during the hours between her arrival at defendant's sanitarium and the time she received her injuries, was in a condition from which a reasonable person could conclude that she might do harm to herself unless restrained and that such condition was known to and recognized by defendant's attendants who were charged with the care of plaintiff. The whole of such evidence points to the fact that the behavior of one in plaintiff's condition could not be foretold with any degree of certainty and that, as reported by Mrs. Henke, the practical nurse, to her superiors in the sanitarium, plaintiff ''thought she was in the insane asylum. She wanted to get out because she thought she was in the insane asylum.'' Thereafter, even though the matter of restraints was discussed among the nurses and even though the physician in charge had ordered ''restraint'' as the occasion required, and testified that he wanted plaintiff ''placed in restraint for her own protection,'' no measures were taken to prevent plaintiff from attempting to escape from the sanitarium either by leaping through a window, or otherwise. The windows in plaintiff's room were open, apparently the screens could be opened by ''pushing them out,'' plaintiff was not physically restrained in any way from leaving her bed, and no nurse was in sufficiently close attendance upon her to prevent her from attempting to leave the sanitarium. Under such circumstances

it cannot be said that as a matter of law plaintiff's evidence failed to establish the negligence with which she charges defendant. The issue presented should have been resolved as one of fact rather than as one of law.

■ Defendant cites the cases of *Papini* v. *Alexander Sanitarium, Inc.* (1936), 12 Cal.App.2d 249 [55 P.2d 270], and *Wilbur* v. *Emergency Hospital Association* (1915), 27 Cal. App. 751 [151 P. 155], in support of its contention that plaintiff's evidence would fail to sustain a verdict in her favor. It is sufficient to observe that those two cases and the evidence there considered differ factually from the case here before us to such an extent as to have no persuasive force in defendant's favor. We have also reviewed at some length cases from other jurisdictions cited by both plaintiff and defendant, in which likewise the factual situations differ. From them can be drawn, however, the general proposition that where, as here, plaintiff's evidence establishes that the means of harm were at hand (existent in the physical surroundings) and that defendant had notice or knowledge of facts from which it might reasonably be concluded that a patient would be likely to harm himself or others unless preclusive measures were taken, then defendant must use reasonable care in the circumstances to prevent such harm. As stated above, we are satisfied that plaintiff's evidence, if believed by a jury, is sufficient for such purpose.

Because of our conclusion that for the reasons stated hereinabove the judgment must be reversed it becomes unnecessary to consider other points raised by plaintiff.

The judgment is reversed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied September 27, 1945.