# Rarrick v. Silbert

C.P. of Lackawanna County, no. 02 Civ 4951.

*Malcolm L. MacGregor* and *Patricia Ann Lafferty*, for plaintiffs.
*Mark T. Perry, Frank J. Brier* and *Salvatore Savatteri*, for defendants.

MINORA, *J.,* December 16, 2005—This is a medical negligence action that arises out of psychiatric care and treatment by defendants, Dr. Richard Silbert and Behavioral Healthcare Center P.C. to the plaintiff's husband/father, Gerald Rarrick Jr. Plaintiffs Debbie Rarrick (patient's wife), Jonothan and Ben Rarrick (patient's children) filed the complaint in this matter on December 23, 2003. On January 9, 2004 the defendants, Dr. Richard Silbert and Behavioral Center P.C. (BHC), filed the preliminary objections to the complaint that have previously been decided by the court. Plaintiffs filed a response to the preliminary objections on February 18, 2004. The preliminary objections requested a demurrer on Counts IV, V and VI of plaintiffs' complaint. The court granted the preliminary objections by opinion and order dated March 10, 2004, and recorded March 11, 2004.

In that opinion and order, the court did a comprehensive review of the law on point and allowed plaintiffs leave to amend their complaint joining the same defendants under "theories other than corporate negligence if they so desire." Plaintiffs now seek reconsideration of our March 11, 2004 opinion and order.

## I. FACTUAL HISTORY

On September 18, 2000, the plaintiff, Debbie Rarrick, along with minor-plaintiffs, Jonothan and Ben Rarrick,

were making preparations to move out of the family home the following day due to the rapid decline in marital and familial harmony resulting from Mr. Rarrick Jr.'s deteriorated mental state.

With Mr. Rarrick referencing "guns" and "killing" and specifically threatening Mrs. Rarrick, and having concern about the emotional impact of the family's move on Mr. Rarrick Jr., plaintiff, Debbie Rarrick, phoned defendant Dr. Silbert on multiple occasions to alert him to her grave concerns regarding her husband's behavior and the upcoming stressful event. Mr. Rarrick Jr.'s father called Dr. Silbert to additionally and separately voice his concerns over his son's behavior.

On September 19, 2000, while Debbie Rarrick and her mother awaited the moving van, Mr. Rarrick Jr. entered the kitchen brandishing a shotgun. After firing a shot into the wall and threatening Debbie Rarrick, Mr. Rarrick Jr. tried to force the women into the living room area. While relocating from the kitchen to the living room area, the plaintiff's mother fled and narrowly escaped to try and get help from the authorities. Debbie Rarrick attempted to call 911 several times, but Mr. Rarrick Jr., brandishing a shotgun, prevented her from doing so. Debbie Rarrick attempted to escape by running out of the house through the back door. Fearing for her life and screaming for help as she ran across the front lawn, Mr. Rarrick Jr. chased her, grabbed her and forced her back into the home at gunpoint.

Shortly thereafter, Mr. Rarrick Jr.'s father, Mr. Gerald Rarrick Sr., entered the house and was taken hostage along with Debbie Rarrick. After lengthy negotiations with the police, the ordeal ended with Mr. Rarrick Jr. leaving the home in police custody.

Plaintiff's complaint alleges defendant Dr. Silbert was negligent in that he knew or should have known of the clear and present danger Mr. Rarrick Jr., his patient, represented to plaintiffs and that Dr. Silbert failed to take any action to defuse the explosive situation. Dr. Silbert responds by attacking Counts IV, V and VI of plaintiffs' complaint in his preliminary objections.

## II. LEGAL ANALYSIS

Count IV of the complaint continues to assert a cause of action against Behavioral Healthcare Center P.C. on behalf of plaintiff Debbie Rarrick. Count V asserts a cause of action against Behavioral Healthcare Center P.C. on behalf of plaintiffs Jonothan Rarrick, as a minor, and Debbie Rarrick his parent. Count VI continues to assert a cause of action against Dr. Silbert and trading as Behavioral Healthcare Center P.C. on behalf of Ben Rarrick, as a minor, and Debbie Rarrick as his parent. All three counts identically state the following on behalf of the various plaintiffs:

"The gross, careless and negligent conduct of defendant Behavioral Healthcare Center P.C. consisted of:

"(a) employing defendant doctor and its employees with knowledge of their lack of sufficient qualifications, capabilities or experience and/or failing to investigate or ascertain the extent of the same;

"(b) recommending, referring and holding out defendant Dr. Silbert to Mr. Rarrick Jr. and plaintiffs as being a competent, knowledgeable and experienced psychiatrist, capable of handling Mr. Rarrick Jr.'s psychiatric problems;

"(c) failing to require and direct through policies and procedures, the prompt and continuing review of the patient's condition;

"(d) failing to properly train and supervise its employees, including defendant Silbert, while they rendered psychiatric care to plaintiff;

"(e) failing to supervise the quality of care rendered by defendant Dr. Silbert and/or its employees, servants, and/or agents;

"(f) failing to contract competent psychiatrists to provide psychiatric services;

"(g) failing to promulgate sufficient rules, regulations, procedures and policies to ensure that mental health procedures promulgated by the State of Pennsylvania are followed;

"(h) failing to ensure that prescribed rules, regulations, policies and accepted psychiatric standards and procedures were complied with in the care and treatment of Mr. Rarrick Jr.;

"(i) failing to select and train only competent psychiatrists and employing incompetent psychiatrists such as defendant Silbert;

"(j) failing to select and retain only competent employees, servants and/or agents and employing incompetent employees, servants and/or agents;

"(k) failing to oversee the actions of the defendant psychiatrist as to patient care;

"(l) failing to take corrective action to remedy the defects of procedures which created the harms visited upon plaintiff when defendant Behavioral Center P.C. knew

or should have known of the problems set forth in the preceding and subsequent paragraphs and incorporated herein by reference;

"(m) failing to have a sufficient number of trained and qualified employees at all times capable of recognizing plaintiff's emotional problems and of bringing the same to the attention of other practitioners so that adequate consultation could have been secured and such conditions addressed so as to avoid harm to others;

"(n) failing to use reasonable care in determining the qualifications of the defendant doctor rendering psychiatric services to Mr. Rarrick Jr. and reviewing the treatment rendered by the defendant doctor;

"(o) failing to use reasonable care in selecting, reviewing and/or supervising members of its medical staff; and,

"(p) failing to establish and follow emergent procedures for the timely evaluation and treatment of patients like Mr. Rarrick Jr."

The defendant contends these counts contain causes of action sounding in corporate negligence against Behavioral Healthcare Center P.C. that are not legally supported by Pennsylvania law, and as such their preliminary objections, in the form of a demurrer, should be granted. Plaintiffs argue that subparagraphs (a) through (p), stated above, set forth plaintiffs' allegations of negligence against defendant BHC. These allegations, plaintiffs contend, in and of themselves, read in a light most favorable to plaintiffs, based on the entire complaint, set forth causes of actions which form a basis for recovery, and for these reasons defendant's request for demurrer should be denied.

## A. *Standard of Review*

Preliminary objections, the end result of which would be dismissal of a cause of action, should be sustained only in cases that are free and clear from doubt. *Bourke v. Kazaras,* 746 A.2d 642, 643 (Pa. Super. 2000). To be clear and free from doubt, it must appear with certainty that the law will not permit recovery by the plaintiff upon the facts averred. *Gallo v. Nationwide Insurance Company,* 791 A.2d 1193, 1195 (Pa. Super. 2002). If there is any doubt as to whether preliminary objections should be granted, it must be resolved in favor of overruling the objection. *Allegheny Sportsmen's League v. Ridge,* 790 A.2d 350, 354 (Pa. Commw. 2002).

## B. *The Doctrine of Corporate Negligence*

The defendant argues that plaintiffs' complaint fails to state a claim for corporate negligence under Pennsylvania law because a claim for corporate negligence is available only against a hospital or HMO and is not available against a private physicians' practice group, clinic or private physician. Our Supreme Court established a hospital's liability for corporate negligence in *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991). The *Thompson* court defined the doctrine as follows: corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient. Therefore, an injured party does not have to rely on and establish the negligence of a third party.

The hospital's duties have been classified into four general areas: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment, *Thompson, supra* at 339, 591 A.2d at 707, citing *Chandler General Hospital Inc. v. Purvis,* 123 Ga. App. 344, 181 S.E.2d 77 (1971); (2) a duty to select and retain only competent physicians, *id.,* citing *Johnson v. Misericordia Community Hospital,* 99 Wis.2d 708, 301 N.W.2d 156 (1981); (3) a duty to oversee all persons who practice medicine within its walls as to patient care, *id.,* citing *Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 211 N.E.2d 253 (1956); and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality of care for the patients, *id.,* citing *Wood v. Samaritan Institution,* 26 Cal.2d 847, 161 P.2d 556 (Cal. App. 1945).

The *Thompson* court provided the following rationale for imposing these duties on hospitals:

"Hospitals in the past enjoyed absolute immunity from tort liability. See *McDonald v. Massachusetts General Hospital,* 120 Mass. 432, 21 Am.Rep. 529 (1876). The basis of that immunity was the perception that hospitals functioned as charitable organizations. See *Forrest v. Red Cross Hospital,* 265 S.W.2d 80 (Ky. 1954). However, hospitals have evolved into highly sophisticated corporations operating primarily on a fee-for-service basis. The corporate hospital of today has assumed the role of a *comprehensive* health care center with responsibility for arranging and coordinating the *total health care* of its patients. As a result of this metamorphosis, hospital immunity was eliminated." 527 Pa. at 337-38, 591 A.2d at 706. (emphasis added)

Plaintiffs would urge upon this court that their allegations in Counts IV, V and VI do not sound in corporate negligence and therefore defendant Dr. Silbert's preliminary objections should be denied. A cursory examination of the plaintiffs' allegations in the three Counts IV, V and VI against defendant's Behavioral Healthcare P.C. reveals a contrary view to plaintiffs' is correct.

*Thompson, supra,* at 339, 591 A.2d at 707, sets forth four well established duties which sound in a duty to use reasonable care in: (1) "the maintenance of safe and adequate facilities and equipment," (2) "a duty to select and retain only competent physicians," (3) "a duty to oversee all persons who practice medicine within its walls as to patient care," and (4) "a duty to formulate, adopt and enforce adequate rules and policies to ensure quality of care for the patients."

Comparing these corporate negligence duties to plaintiffs' identical allegations of negligence repeated at Counts IV, V and VI we see that subparagraphs (a) and (b) fall under *Thompson* duty number (2). Subparagraph (c) falls under *Thompson* duty number (4). Subparagraph (d) arguably falls under *Thompson* duty number (3). Subparagraph (e) arguably falls within *Thompson* duty number (3). A further review by subparagraph continues to yield similar results. Counts IV, V and VI are substantially permeated with the language of corporate negligence found in *Thompson,* and yet not allowed to be applied in the context of the physician's office setting herein.

In short, the *Thompson* court imposed such duties on hospitals because today's hospital functions as a highly sophisticated corporation assuming the role of a comprehensive health care center with the responsibility of

arranging and coordinating the total health care of its patients. An office of a physician has not yet been held to this same corporate negligence standard by our appellate courts.

### C. *Expansion of the Corporate Negligence Doctrine to Entities Other Than Hospitals*

Initially, hospitals were the only medical providers subject to liability under the doctrine of corporate negligence. Our Superior Court in *Shannon v. McNulty,* 718 A.2d 828, 835 (Pa. Super. 1998) then extended such liability to health maintenance organizations (HMOs). Reasoning that an HMO performs the same or similar function as a hospital, the Superior Court stated:

"We recognize the *central role* played by HMOs in the *total health care* of its subscribers. A great deal of today's healthcare is channeled through HMOs . . . . Specifically, while these providers do not practice medicine they do involve themselves daily in decisions affecting their subscriber's medical care. These decisions may, among others, limit the length of hospital stays, restrict the use of specialists, prohibit or limit post hospital care, restrict access to therapy, or prevent rendering of emergency room care." (emphasis added)

Thus, the Superior Court extended the doctrine of corporate liability to HMOs because of the HMOs' central role in making critical decisions in a patient's healthcare, such as length of hospital stay, use of specialists, access to therapy and rendering of emergency room care.

Beyond HMOs, as defendant points out and plaintiff acknowledges, Pennsylvania trial courts have dismissed claims of corporate liability against professional corpo-

rations. The U.S. District Court for the Eastern District declined to apply the doctrine to an optometrist's office. *Milan v. American Vision Center,* 34 F. Supp.2d 279, 282 (E.D. Pa. 1998). A three-judge panel of the Dauphin County Common Pleas Court agreed that the doctrine does not apply to physician practices in a case in which the plaintiff alleged the negligent medical treatment resulted in an above the knee amputation. *Dowhouer v. Judson,* 45 D.&C.4th 172 (Dauphin Cty. 2000).

Locally, recent court decisions have declined to extend corporate liability beyond HMOs. In *Brewer v. Geisinger Clinic Inc.,* 45 D.&C.4th 215 (Lacka. Cty. 2000), Judge Cottone granted the defendant's preliminary objections, reasoning that although appellate courts have extended corporate liability claims to hospitals and HMOs, they have not yet determined whether corporate liability should extend to clinics. In his opinion, Judge Cottone cited *Dibble v. Penn State Geisinger Clinic Inc.,* 42 D.&C.4th 225 (Lacka. Cty. 1999).

In *Dibble,* the clinic argued in their preliminary objections that a claim for corporate negligence is strictly limited to hospitals and does not extend to individuals or group medical practices such as the clinic. This court agreed and granted the clinic's preliminary objections, reasoning that "the clinic, like a hospital and an HMO, is a critical component of the comprehensive health care delivery system to the patient. . . . Despite this role, a clinic cannot be considered a comprehensive health care center such as a hospital, nor can it be construed to play a central role in the 'total health care of its subscribers.' " *Dibble, supra* at 233, citing *Shannon, supra.* Thus, in declining to extend corporate liability to clinics, the doc-

trine of corporate liability has yet to be extended beyond hospitals and HMOs.

Just as in *Dibble,* this court is faced with the same restraints imposed by the appellate courts in *Shannon* and *Thompson.* The *Shannon* and *Thompson* courts imposed corporate liability on hospitals and HMOs because of their central role in making critical decisions in a patient's healthcare as well as their role as a comprehensive health care center with the responsibility of arranging and coordinating the total health care of its patients.

Here, plaintiff seeks to extend corporate liability to Behavioral Healthcare Center P.C. However, there are neither facts nor any allegations in the pleadings to suggest that BHC's role in a patient's healthcare can be described as central, total or comprehensive. To the contrary, the complaint states that BHC's role was limited to providing psychiatric health care and services to Mr. Rarrick Jr.

While psychiatric services play an important role in the healthcare of a patient, they certainly cannot be described as central, total or comprehensive; rather, they are but one branch of medicine dealing with mental, emotional or behavioral disorders. Unlike the comprehensive role in a patient's healthcare provided by a hospital, or the central role a HMO plays in critical decisions in the healthcare of their patients, psychiatric services serve only one branch of medicine that applies only in limited and appropriate circumstances. In essence, psychiatry has neither the role of the comprehensive health care center nor the central role in making critical decisions in a patient's total healthcare. Psychiatry clearly has a role in making decisions but not a central role.

Given these findings and the binding precedent established by *Shannon* and *Thompson,* we have previously held in our earlier opinion that the clinic's preliminary objections to Counts IV, V and VI dealing with corporate liability are granted, and dismissed these counts. Plaintiff now seeks reconsideration of that ruling.

### III. PLAINTIFFS' RECONSIDERATION

Plaintiffs now cite yet another local decision in the case of *Oven v. Pascucci,* 46 D.&C.4th 506 (Lacka. Cty. 2000). In that case, similar defense preliminary objections were denied by the court and the plaintiff was allowed to proceed on the theories of corporate negligence against Northeast Eye Institute as well as the defendant doctors who were determined to be vicariously liable as well. The *Oven* court cites a number of federal and county cases for the proposition that there is no logical reason to stop this doctrine of corporate negligence at hospitals and HMOs. There lies the pivotal issue. Quite candidly, a search of the cases reveals trial court-level precedent both for and against the expansion of the doctrine of corporate negligence.

These plaintiffs now urge upon the court a case-by-case review of corporate negligence allegations against healthcare institutions other than hospitals and HMOs, using a functional duty analysis. In essence, they urge that if a complaint properly pleads some form of one, some or all of the four Nason Hospital duties, then and in that event, discovery should be allowed to proceed past the preliminary objection stage and the validity of the corporate negligence allegations ought to be tested via summary judgment motions upon the completion of their discovery. Defendant believes objections without

discovery are the proper test for what they argue is an invalid expansion of the *Thompson* doctrine of corporate negligence.

The court, upon review of the two watershed cases, is forced to inquire as to whether the "comprehensive health center" language in *Thompson, supra* at 338, 591 A.2d at 706, is dicta or a mandatory gate-keeping hurdle that must be overcome as a condition precedent before doing a functional duty analysis. The same concern can be addressed relative to the *Shannon* case *supra*. Does the court's language recognizing that an HMO plays a "central role" in the "total health care of its subscribers" represent dicta, or should the language operate as a mandatory gate-keeping hurdle that must be overcome as a condition precedent to doing a functional duty analysis?

In analyzing these issues, we must first attempt to discern whether the *Thompson* and *Shannon* language cited above is the reason the court found a hospital, as a comprehensive healthcare provider, and an HMO, as having a central role in the healthcare of its subscribers, should be subjected to corporate negligence exposure. In essence, the inquiry needs to determine whether the language in these two opinions is dicta or represents the rationale for the courts' holding. Upon review of the two watershed cases noted above, the court is forced to inquire as to whether this "comprehensive health center" language in *Thompson* at 338, 591 A.2d at 706 is dicta or a mandatory gate keeping hurdle that must be overcome as a condition precedent before proceeding to the point of doing a functional duty analysis.

The same concern can be addressed relative to the *Shannon* case *supra*. Does the Superior Court's language recognizing that an HMO plays a "central role" in the

"total healthcare of its subscribers" represent dicta, or should that language also act as a mandatory gate-keeping hurdle that must be overcome as a condition precedent before proceeding to the point of doing a functional duty analysis?

According to Webster's Third New International Dictionary, unabridged, on page 627, dicta or dictum is defined as, "(2) an opinion expressed by a judge on a point not necessarily arising or involved in a case in question or necessary for determining the rights of the party involved."

That same dictionary on page 1885 defines the word "rationale" as, "(1) an explanation or exposition of controlling principles . . . (2) the underlying reason: a rational basis: justification: ground."

Since we last visited this issue, a number of other trial court opinions have been issued, but none provides this court with the clear guidance of appellate case law normally required and desired.

Accordingly, we will revisit *Thompson v. Nason Hospital, supra* and *Shannon v. McNulty, supra,* again with a precise and discerning eye.

In the watershed case of *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991), our Supreme Court clearly established duties that a *hospital* owes its patients. This court is guided by both the wording in the opinion itself as well as the insightful analysis of *Milan v. American Vision Center,* 34 F. Supp.2d 279 (E.D. 1998). In *Milan,* the Eastern District Court noted that *Thompson* adopted a theory of hospital liability only. In *Milan,* page 280, the court notes, "*Thompson* sets a standard of care for hospitals, not necessarily all healthcare organiza-

tions." Later, this opinion discussed Justice Flaherty's dissent and concludes, "the court itself focused solely on hospitals."

The *Milan* court rationale for its conclusion is the plain meaning of the wording in the *Thompson* opinion.

"The use of the language throughout *Thompson* similarly suggests that the Supreme Court believed itself to be crafting a rule of hospital liability, not healthcare organization liability generally. Thus, the first sentence of the decision defining the court's jurisdiction notes that, 'allocatur was granted to examine the novel issue of whether a theory or corporate liability *with respect to hospitals* should be recognized.' " *Milan* at page 280, citing *Thompson* at 332, 591 A.2d at 704. (emphasis added)

As the *Milan* court directs us, when we review the precise language of *Thompson,* it becomes clear that the Supreme Court consistently remained focused on hospitals only and not healthcare organizations generally. In addition to the focus noted above, the Supreme Court frames the issue from defendant's petition for allowance of appeal as, "Did the Superior Court err in adopting a theory of corporate liability with respect to a hospital . . . ?" *Thompson* at 336, 591 A.2d at 706. After a review of the history of hospital liability in the Commonwealth, the Supreme Court in *Thompson* at 339, 591 A.2d at 707, stated, "We now turn our attention to the theory of corporate liability *with respect to the* hospital . . . ." (emphasis added) The opinion continues when it notes, "a critical step towards recognition of this theory of *hospital liability* has already been taken . . . ." *Id.* at 340, 591 A.2d at 708. (emphasis added)

When the decision is formally announced within the *Thompson* opinion, the court stated, "Today we take a step beyond the *hospital's* duty of care as delineated in *Riddle* in full recognition of the *corporate hospital's role* in the *total healthcare* of its patients. In doing so, we adopt as a theory of *hospital liability* the doctrine of corporate negligence or corporate liability under which a *hospital is liable. . . ." Id.* at 341, 591 A.2d at 708. (emphasis added)

Clearly then, the scope in *Thompson* is narrowly confined to hospitals and not other healthcare organizations generally.

Subsequent to *Thompson,* in the case of *Shannon v. McNulty,* 718 A.2d 828 (Pa. Super. 1998), the Superior Court reviewed the *Thompson* case and held that it was proper to apply the corporate negligence doctrine from *Thompson* to health maintenance organizations (HMOs) such as involved with *Shannon.* This was viewed by some as an expansion of the doctrine that was feared in the dissenting opinion of Justice Flaherty in the *Thompson* case. This court submits that the characterization of applying this corporate negligence doctrine to an HMO as an expansion may not be accurate.

When the *Shannon* case is viewed in terms of the actions or duties of the HMO, essentially our Superior Court found that HMOs should be held under the *Thompson* doctrine of corporate negligence because the HMO, in essence, was behaving like a hospital. This similarity of behavior was what the court used as its basis for holding HMOs responsible.

In *Shannon, supra* at 835, the Superior Court stated quite clearly that HMOs played a central role in the

healthcare of its subscribers. This was compared to the corporate hospital's role in the total healthcare of its patients in *Thompson.*

"In adopting the doctrine of corporate liability, the *Thompson* court recognized 'the corporate hospital's role in the *total healthcare* of its patients.' *Thompson, supra* at 708. Likewise, we recognize the *central role* played by HMOs in the *total healthcare* of its subscribers. A great deal of today's healthcare is channeled through HMOs with the subscribers being given little or no say-so in the stewardship of their care. Specifically, while these providers do not practice medicine, they do involve themselves daily in *decisions affecting their subscribers' medical care.* These decisions may, among others, limit the length of hospital stays, restrict the use of specialists, prohibit or limit post-hospital care, restrict access to therapy or prevent rendering of emergency room care . . . when decisions are made to limit a subscriber's access to treatment, that decision must pass the test of medical reasonableness. To hold otherwise would be to deny the true effect of the provider's actions, namely, dictating and directing the subscriber's medical care." (emphasis added)

Later in *Shannon, supra* at 836, the court stated, "We see no reason why the duties applicable to hospitals should not be equally applied to an HMO *when that HMO is performing the same or similar functions as a hospital.*" (emphasis added) Subsequently, the Superior Court in *Shannon, supra* at 836, reiterates this distinction by stating, "When a benefits provider, be it an insurer or managed care organization, interjects itself in the rendering of medical decisions affecting a subscriber's care, it must do so in a medically reasonable manner."

If there remained any doubt as to the actions giving rise to culpability needing to be similar to those of a hospital, the *Shannon* court initially stated at page 835, "[w]here the HMO is providing health care services rather than merely providing money to pay for services, their conduct should be subject to scrutiny." What the Superior Court is saying is *only* under those circumstances where a benefits provider chooses to provide services similar to a hospital should their actions be subject to the scrutiny, not where they are merely providing money for care.

In short, if a benefit provider elects to dictate and direct the total healthcare of its subscribers, it will be held to the *Thompson* doctrine of corporate negligence because, in essence, it is choosing to behave in a manner similar to that of a hospital. The plain reading of both *Thompson* and *Shannon* seems to dictate this result.

Returning to our earlier questions of the dispute between dicta and rationale, it now becomes apparent that the wording in *Thompson,* "the corporate hospital's role in the *total healthcare of its patients. . . ." Thompson, supra* at 341, 591 A.2d at 708, is mandatory gate-keeping language and not simply dicta. Likewise, the *Shannon* language recognizing "the central role played by HMOs in the *total healthcare of its subscribers*" is also rationale. This is because HMOs involve themselves daily in decisions affecting their subscribers' medical care and perform the same or similar functions to a hospital. *Shannon, supra* at 835, 836. Therefore, it is also mandatory gate-keeping language.

In *Milan v. American Vision Center,* 34 F. Supp.2d 279 (E.D. 1998), the federal court did an analysis of the above

tenets in the context of a vision center. This court concluded that the doctrine of corporate negligence should not be extended to optometrist offices. The rationale was that *Thompson* applied to hospitals, not healthcare organizations liability generally.

However, see the opinion of Judge Nealon in the case of *Oven v. Pascucci,* 46 D.&C.4th 506 (2000). In that opinion, Judge Nealon concluded that Oven's allegations, if proved by the plaintiff, could satisfy a corporate negligence claim under *Thompson.* In *Oven,* the court was dealing with the Northeast Eye Institute (NEI), which practiced medicine and provided health care to its patients. NEI was not an insurer nor an HMO, nor a benefits provider; therefore, *Shannon* was not as appropriate a guidepost as was *Thompson.*

The court in *Oven* found that corporate negligence could apply as alleged by plaintiff but ultimately said the matter was academic because the corporation, NEI, "may nonetheless be vicariously liable" *id.* at 523, for the actions of its two doctors. This conclusion negated any potential dispute because an eye specialty group may not be viewed as providing for the *total* healthcare of its patients per *Thompson.*

Judge Nealon's opinion in *Oven* does a scholarly job of framing the history of hospital corporate liability and the disputes among varying courts of common pleas regarding corporate negligence. We have attempted to discern a consistent rationale for those cases which have allowed corporate liability to entities other than hospitals. We have discussed at length *Thompson* and *Shannon.* If we ignore *Shannon,* since it applied to a benefits provider, and look to other cases, a trend does seem to emerge.

In the Dauphin County case of *Irvin v. Fierer,* 49 D.&C.4th 225 (Dauphin Cty. 2000), the court overruled an earlier case to the contrary, *Dowhouer v. Judson,* 45 D.&C.4th 172 (Dauphin Cty. 2000). That case found that corporate negligence doctrine did not apply to a physician's practice group because "the facts in the instant case do not indicate the plaintiff was required to commit to a single health care provider for treatment. . . ." *Dowhouer, supra* at 181. In September of 2000, a mere five months later, Dauphin County permitted the plaintiff to pursue a claim of corporate negligence against an incorporated medical practice. In the *Irvin* case, the rationale for this different view was, "the facts in this case are clearly distinguishable from the facts in *Dowhouer.*" *Irvin, supra* at 230. Plaintiff Irvin argued that she was subjected to a number of tests at KFKA's offices. She further argues that KFKA made a conscious decision to expand its role as not just an office that practiced internal medicine, but a facility that then provided to the plaintiff many surgical and invasive procedures, thus rendering KFKA accountable. The plaintiff was allowed to proceed because of the "significant control exercised by the corporation over *Ms. Brown's total health care* needs as alleged in [the] complaint." *Irvin* at 231. (emphasis added)

The Dauphin County court referred the federal case of *Fox v. Horn,* 2000 WL 49374 (January 21, 2000 E.D. Pa.). In that case, an inmate at Graterford Prison sued CPS, a contracted healthcare provider to the prison. The court therein allowed the corporate negligence suit to proceed because organizations like CPS are responsible for their "patients' total healthcare choices. An inmate, Fox, had no meaningful choice in his health care choices, but to

rely on what was provided to him at SCI-Graterford." Since CPS did significantly control Fox's total healthcare, he was permitted to continue with his corporate negligence count. *Fox* at p. 8. This was the federal court's prediction of how our appellate courts would rule.

Plaintiffs would have us allow the case to proceed through discovery and then have the corporate negligence count be tested via summary judgment. While there may exist a pleading and fact pattern where such a course of conduct should be permitted, this case is not it. It is more appropriate to reject plaintiffs' theory as a legal nullity at the preliminary objection stage per *Thompson*.

The discernible trend seems to be to look at *Thompson* and *Shannon* as hospital-based or hospital behavior-based claims which should allow for corporate negligence counts to be pursued. The rationale is because they have somehow allowed themselves to become involved in the total healthcare of their patients or subscribers.

In our case, we are dealing with a professional corporation and physician/psychiatrist who have a specialized focus in their practice of medicine. Their role addresses the mental health needs of their patients through counseling and medication. They have not expanded to perform other services and as such they cannot, in our view, be construed to be involved in the *total healthcare of their patients*. Accordingly, their count in corporate negligence must fail as we have earlier concluded as well.

However, when plaintiffs' complaint is read as a whole, plaintiffs' complaint could be read to assert theories of liability against BHC based on vicarious liability or agency. For this reason, plaintiffs will be permitted to amend Counts IV, V and VI of their complaint to sound

in these theories other than corporate negligence if they so desire.

## IV. CONCLUSION

In conclusion, we agree with defendant's contentions that Counts IV, V and VI of plaintiffs' complaint inappropriately attempt to apply the theory of corporate negligence doctrine to Behavioral Healthcare Center, a professional corporation provider of psychiatric services. For this reason, defendant's preliminary objections are granted and Counts IV, V and VI of plaintiffs' complaint are dismissed.

However, as previously stated, when plaintiffs' complaint is read as a whole, the complaint could be read to assert theories of liability against BHC based on vicarious liability or agency theories. For this reason, plaintiffs will be permitted to amend Counts IV, V and VI of their complaint if they so desire. An amended complaint shall be filed within 20 days of this order or plaintiffs may proceed upon their remaining counts without amendment.

## ORDER

And now to wit, December 16, 2005, upon due consideration to defendants Dr. Richard Silbert and Behavioral Healthcare Center's preliminary objections to Counts IV, V and VI of plaintiffs' complaint and the response of plaintiffs, it is hereby ordered and decreed that defendants' preliminary objections to Counts IV, V and VI of plaintiffs' complaint are granted. Plaintiffs are granted 20 days to amend Counts IV, V and VI to theories other than corporate negligence if they so desire.